**Arthur A. WILLIAMS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 21072.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 19, 1968.

Decided Feb. 24, 1969.

Mr. M. Michael Cramer, Washington, D. C. (appointed by this court) for appellant. Mr. H. Thomas Sisk, Washington, D. C. (appointed by this court) also entered an appearance for appellant.

Mr. John G. Gill, Jr., Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before DANAHER,* McGOWAN and LEVENTHAL, Circuit Judges.

## PER CURIAM:

 This appeal from a conviction for robbery presents a due process issue deriving from a pretrial identification in 1966.[1] Since the trial occurred prior to the decision in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), that issue as such was not raised in the trial court. There was, however, extensive testimony relating to the conditions under which the eyewitnesses observed the perpetration of the crime, and to the intervening events prior to the in-court identifications made by both such witnesses. The facts with respect to police-station identification efforts were elicited by the defense on cross-examination.

The two eyewitnesses who testified for the Government, Patricia Spisso and Gloria Washington, were employed in the office of the apartment building which was robbed. Miss Spisso testified that, on the afternoon of February 1, 1966, she and Miss Washington were alone in the office of the apartment complex. She was talking on the phone when three men entered. One of the men, whom she identified as appellant, carried a sawed-off shotgun; he walked up to her, took the phone out of her hand, and ordered her into the back room where the money was kept in an office safe. Once in the back room, appellant kept Miss Spisso under guard while one of the other robbers took the money out of the safe. After emptying the safe, and taking some more money which was lying on a counter in the back room, the three men put the two women in a back storeroom and left by a side door.

Miss Washington's description of the crime coincided with that of her fellow employee. She also identified appellant as the robber who was carrying a gun. Miss Washington testified that, while the safe was being emptied, she was kept under guard by the third robber in the outer office, but nonetheless could see what went on in the back through the open doorway. She was unable to describe in detail either the dress or physical appearance of the other two robbers, but did give a careful description of appellant and his clothing. As was acutely observed from the bench during argument, this was possibly due to appellant's carelessness in mixing business with pleasure, for Miss Washington testified that, just before his departure, appellant had slapped her on the "behind." Miss Washington, obviously as unintimidated as she was unimpressed, stated that she had thereupon "turned around and got a good look at him just to show him that I didn't appreciate it." In all, the robbery took somewhere between 6 and 10 minutes.

On cross-examination, it was revealed that both of these witnesses had been shown mug shots shortly after the crime had occurred, but neither had identified anyone from the photographs. The rec-

---

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

1. Appellant also claimed reversible error because of the admission for impeachment purposes of a prior conviction of appellant for the misdemeanor of taking property without right. *See* Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965). But the District Court weighed the request to exclude conscientiously, and did in fact bar a prior conviction for robbery. Appellant argues that (1) this court should construe § 305 as not comprehending *any* misdemeanor conviction, and (2) the conviction admitted here should have been excluded because it was entered on a plea of guilty. We are not persuaded on either score.

ord does not reveal whether appellant's picture was among those shown to the witnesses. Each witness also acknowledged on cross-examination that she had identified appellant in the robbery squad room of the police station about a month after the crime.[2]

It is true, as appellant urges upon us, that we do not know precisely what the conditions were of the police station confrontation, and it might be that fuller ventilation of them would establish a *Stovall* deficiency. But, even if we assume such a defect, we do not think a remand is necessary here because the record before us provides an independent source for the two in-court identifications of such a nature as to dispel any substantial likelihood of misidentification. Clemons v. United States, 133 U.S.App.D.C. ——, 408 F.2d 1230 (1968). Two witnesses had excellent, not to say unique in the one instance, opportunities for sustained observation at the time of the crime, and each made firm and positive identifications of appellant at trial. Miss Spisso's testimony about the police station confrontation indicates that she recognized appellant the moment she entered the room. Under these circumstances, the failure of the photographic effort seems inconclusive, especially since we do not know that appellant's picture was among those viewed.

Affirmed.

2. The following testimony by Miss Spisso is essentially what the record shows with respect to the circumstances of the police station identification:

Q. And when did you see the defendant for the first time after that?

A. Well, I was called down to the Robbery Squad, and he was in the Robbery Squad Room when I walked in.

Q. Do you know what date that was?

A. That was in March. I had just returned from a trip. I had been out of town and I was still home.

Q. So it was about a month later?

A. Yes, it was around the first of March. I can't remember the exact day but I know it was in March.

Q. And do you recall what he was wearing at that time?

A. He had a shirt and slacks, just a sportlike shirt, but I can't really remember what he had on because I was more interested in his face. I was so shocked to see him standing—excuse me, I think I am going to lose my voice.

Q. Did he have a hat on?

A. I think they put a hat on him after we were in there when I had told them that was the man that robbed me. I think they put a hat on him.