UNITED STATES of America

v.

Robert E. WILLIAMS, Appellant.

UNITED STATES of America

v.

Gerald COLEMAN, Appellant.

Nos. 24805, 24806.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 14, 1971.

Decided April 19, 1972.

Rehearing Denied May 22, 1972.

Certiorari Denied Oct. 10, 1972.
See 93 S.Ct. 203.

Mr. Philip B. Brown, Washington, D. C. (appointed by this court), for appellants.

Mr. Roger M. Adelman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry, William H. Collins, Jr. and Roger E. Zuckerman, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges.

PER CURIAM:

This court sitting *en banc* affirmed these cases on all issues except "as to whether the lineups and in-court testi-

mony on identification constitute the kind of unfairness that taints a conviction under Stovall v. Denno." As to those issues we remanded to the District Court "for *Stovall* hearings and appropriate determinations concerning the identification of appellants." Williams v. United States, 136 U.S.App.D.C. 158, 165, 419 F.2d 740, 747 (1969) *(en banc)*. After full hearing the District Court found that the evidence revealed no due process defect in the identifications of these appellants by witnesses at trial. These appeals are limited to the District Court's decision on remand.

■■ We agree that, for the reasons stated in Judge Bazelon's concurring and dissenting opinion, the conviction as to Coleman should be affirmed. As to appellant Williams, we find that his conviction also should be affirmed. The lineups in these cases were conducted prior to the decisions of the Supreme Court in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). While these lineups would certainly not pass muster today, we cannot say that the *Williams* lineup,* considering the time it was held, was so lacking in fundamental fairness as to violate due process.

Affirmed.

BAZELON, Chief Judge, concurring in part and dissenting in part:

These appeals are before us following remand "for *Stovall* hearings and appropriate determinations concerning the

identification of appellants"[1] made by the sole eye-witness to the crime, one Mrs. Neal, at two separate lineups, each involving only one of the appellants. The remand proceedings culminated in a determination that neither lineup violated due process and the majority now affirms both convictions. I agree, with the conclusion reached with respect to appellant Coleman in No. 24,806.

I think the affirmance of Williams' conviction in No. 24,805, however, rests (1) on the unwarranted view that Stovall v. Denno[2] is without vitality in retroactive application; and (2) on a *sub silentio* overruling of our unanimous *en banc* decision in Clemons v. United States.[3] As a result, a man whose guilt is in the gravest doubt is imprisoned for life. Accordingly, I dissent.

Because the Court accords such perfunctory treatment to the substantial claims of both appellants, I must discuss the issues at greater length.

*I. No. 24,805—United States v. Williams*

The Williams lineup was held without the presence of counsel, one week after the crime, and before the Supreme Court's decision in *Wade*.[4] Williams does not assert that the police intentionally indicated to Mrs. Neal that he was the prime suspect. Rather, he claims that the physical characteristics of the lineup's participants were such that only he met the description of the offender given the police by Mrs. Neal after the crime. The description received by the police stressed only two salient physical characteristics: that the offender was quite short—only slightly taller than the

---

*  The *Williams* lineup is described in the concurring and dissenting opinion.

1. Williams v. United States, 136 U.S.App. D.C. 158, 165, 419 F.2d 740, 747 (1969). Appellants were charged with attempted robbery and felony murder. In July 1966 a first trial ended in a hung jury. A second trial followed in May 1967 and resulted in verdicts of guilty. In their original appeal, the Court, sitting *en banc*, resolved all other issues against appellants.

2. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

3. 133 U.S.App.D.C. 27, 408 F.2d 1230, cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

4. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

witness's own 5'1"—and that he was young. An examination of the photograph of the lineup reveals that only two of the six participants could reasonably be characterized as short, and that appellant Williams appears to be some four to six inches shorter than the remaining four participants.[5] Moreover, the only other short man in the lineup appears demonstrably older than appellant. Mrs. Neal's testimony at both the remand hearing and at trial [6] demonstrates that the differences in physical appearance among the participants in the lineup had the predictable effect of focusing her attention on appellant.[7]

5. *Cf.* Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

6. At the remand hearing Mrs. Neal testified as follows:

Q. Did you feel that your memory or your recollection of that face, that is, the taller man's face, was a lot better than your memory of the other man's face?
A. Well, yes.
Q. Now, when you went into the room, did you look for a taller man, that is, the taller man in the line-up?
A. Yes.
Q. Did you see him?
A. No.
Q. How long did it take you to determine that the taller man was not in that lineup?
A. As I looked at all of the fellows in the line-up.
Q. As soon as you looked at each face?
A. Yes.
Q. So you arrived at that conclusion pretty fast then, is that correct?
A. Yes.
Q. What did you do then? Did you start looking for the other man then?
A. Yes, I saw him in there.
Q. Did you see him in there before you started looking for the tall man or afterwards?
A. I don't know. I don't remember that.
Q. Well now, you knew that the man, thought that you remembered the man, the shorter man, as being quite short, did you not?
A. Right.
Q. Did you see a man in that line-up who was quite short?
A. Yes.
Q. How many men did you see that were quite short?
A. Well, there was two, I thought.
Q. What were the comparative ages of those two shorter men?
A. Quite a bit. I would say quite a bit.
Q. Quite a bit different in age?
A. Yes.
Q. How many short young men about the same age as the man whom you had glanced at in the liquor store did you see in that line-up?

A. That was the only short young one, I would say.
Q. Now, when you saw the other short man in that line-up, Mrs. Neal, you knew immediately that that was not him, didn't you?
A. Yes.
Q. Why?
A. Because he was an older man and it didn't look like him.
Remand Tr. 42–43. At the second trial, Mrs. Neal also described her impressions of the lineup:
Q. Now, with reference to the height of the Defendant Williams, do you recall what the general height of the people in the line-up were?
A. There were two short ones and one was an old short man.
Q. You testified there were about six men in the line-up, is that correct?
A. I would say five or six.
Q. Five or six.
A. Au huh [sic].
Q. How many short men were there?
A. Two short men?
Q. One of the men was older?
A. Yes.
Q. Pretty old?
A. Au huh [sic].
Second Trial Tr. 451.

7. It may be argued that if the lineup was suggestive, all the witnesses, rather than only Mrs. Neal, would have been able to make an identification. This contention, however, misconceives the nature of the lineup's infirmity. We are not faced with a bald attempt to single out a suspect by methods—such as presenting one suspect in handcuffs, or having only uniformed officers as the other participants—which convey their suggestion irrespective of the witnesses' prior description. Rather, the lineup in question was suggestive because only appellant met the general description provided by Mrs. Neal. While thus suggestive as to her, the lineup's impact on the other witnesses would depend on their recollection as to the offender's salient characteristics. As the Government's brief points out, the remaining witnesses were not struck by the shortness of the offender. Government Brief at 19 n. 27.

In *Stovall*,[8] however, the Supreme Court did not condemn all suggestive lineups, but only those which are *unnecessarily* suggestive. Here the Government contends that because the participants in the Williams lineup included all of the individuals left in the cell block at that time, any suggestivity due to the choice of participants, and thus the physical characteristics of the participants, was "necessary."[9]

The Government seeks to excuse the absence of additional subjects by pointing out that Williams' lineup took place before the police began the practice of holding regularly scheduled lineups on Tuesday and Thursday evenings, thereby increasing the pool of available participants. On the morning in question, all those in the cell block had been taken from police headquarters to court with the exception of Williams and five other men.[10] Thus, when it came time to stage the lineup, the police could secure no other short, young subjects, or, for that matter, any other subjects at all.

I think it plain that these circumstances do not reflect the kind of necessity which saved the admittedly suggestive one-man showup in *Stovall*[11] from due process attack. Here the police could have eliminated the entire difficulty by delaying the lineup a few hours. A week had already passed since the occurrence of the crime and there has been absolutely no showing that any prejudice to the legitimate interests of law enforcement would have attended such short delay. In sharp contrast, *Stovall* was premised on the fact that there delay brought with it the most serious prejudice; the witness was dying and an immediate confrontation was imperative.[12] The lineup at which Williams was identified was not only suggestive but also unnecessarily so within the meaning of *Stovall*.[13]

The conclusion that the lineup was "unnecessarily suggestive does not terminate the inquiry. We also must determine whether, in the language of *Stovall v. Denno* [it was] so 'conducive to irreparable mistaken identification that he was denied due process of law.' "[14] For pre-*Stovall* cases this inquiry is controlled by our *en banc* decision in Clemons v. United States,[15]

---

8. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967).

9. "It seems to us that the lineup in the picture (Government Exhibit No. 1) presents the witness with a fair choice, considering the fact, as Detective O'Brien testified, that these men apparently were the only ones left in the cellblock that morning." Government Brief at 17–18.

10. *See* Remand Tr. at 66–70.

11. In Stovall, a Negro defendant was presented to the witness in her hospital room, handcuffed to one of five accompanying white police officers, with the explicit admonition to consider whether this "was the man." 388 U.S. at 295, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

12. 388 U.S. at 302, 87 S.Ct. 1967.

13. The Government offers as an additional element of necessity the fact that Mrs. Neal was but one of several witnesses who viewed the lineup. Thus, the Government contends there was a responsibility to choose participants who conformed to all of the descriptions received by the police from the various witnesses.

We certainly agree that the police have such a responsibility. But as the Government itself points out, the participants in the lineup were the *only* subjects available at that particular time and the absence of other short men was due to this factor rather than the necessity of meeting the descriptions given by the other witnesses. In this regard Officer O'Brien testified:

Q. So then no particular effort was made to find others of the same size and shape and age of Mr. Williams?
A. Not to my knowledge.

Finally, we note that the addition of other short men to the lineup is in no way inconsistent with the responsibility to also include taller men.

14. Gregory v. United States, 133 U.S.App. D.C. 317, 323, 410 F.2d 1016, 1022, cert. denied, 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969).

15. Clemons v. United States, 133 U.S. App.D.C. 27, 408 F.2d 1230 (1969), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

where we held that a suggestive out-of-court identification would not be deemed conducive to irreparable misidentification if a determination could be made that the identification rested upon an independent source.[16]

The standard, however, is not one which allows for mechanical application. This standard requires a prediction: would the witness have identified the defendant absent the impact of the suggestive presentation? And, unlike the superficially analogous prediction required in ascertaining "but for" cause in tort, the independent source prediction rests not on behavior governed by fixed physical rules, but rather on the still speculative psychology of human perception. What plainly emerges from the relevant case law as a minimal requirement, however, is that the witness have an adequate opportunity to observe the offender.[17] Without such an opportunity there can be no reliable identification.[18] There was no such opportunity here.

Mrs. Neal was already in the store at the time the two offenders entered, and she remained in the store until she became frightened and ran out some two or three minutes later. She testified that she initially noticed the men when the proprietor waited on them first despite her prior entrance. At that point, however, she could see only the face of the taller of the two men (whom she later identified as Coleman). The shorter of the two men (whom she later identified as Williams) was standing off to her right. She testified that she glanced over her shoulder; saw only the shorter man's profile and that he had a gun; and quickly turned her head back. This glance was the only time Mrs. Neal saw the shorter man's face and she ran from the store about a minute later.[19]

16. *Id.* at 3, 408 F.2d at 1248 (emphasis added); *see* Gregory v. United States, *supra* note 14. On remand the District Court found "no indications of suggestivity or other impropriety in the manner in which the lineup was conducted," and thus found no occasion to consider the existence of independent source. The record, however, is adequate to allow a determination of independent source by a reviewing court. *See, e. g.,* United States v. Kemper, 140 U.S.App.D.C. 47, 433 F.2d 1153 (1970); Hawkins v. United States, 137 U.S.App.D.C. 103, 420 F.2d 1306 (1969); Cunningham v. United States, 133 U.S.App.D.C. 133, 409 F.2d 168 (1969).

17. United States v. Kemper, *supra* note 16, 140 U.S.App.D.C. at 50, 433 F.2d at 1156; Hawkins v. United States, *supra* note 16, 137 U.S.App.D.C. at 104–105, 420 F.2d at 1307–1308. *See* Allen v. Moore, 453 F.2d 970, 975 (1st Cir. 1970).

18. Whether an opportunity to observe, standing alone, is itself sufficient to constitute an independent source, remains unclear. *Compare* Hawkins v. United States, *supra* note 16, *with* United States v. Kemper, *supra* note 16.

19. Mrs. Neal testified at the remand hearing as follows:

Q. Now, the look that you got, you got by turning your head around, did you not?

A. Yes.

Q. And it was at this point that you saw Mr. Williams, the second man, or the man that you have identified as Mr. Williams?

A. That's right.

Q. How long did you keep your head turned around, would you say?

A. What do you mean?

Q. When you looked around at the second man?

A. I just looked at him like that and turned my head back around.

Q. And you only saw a profile, did you not?

A. Yes.

\*       \*       \*       \*       \*

Q. Now, other than the look that you got of this second man when you turned around—

A. Yes.

Q. —Mrs. Neal, did you ever see any part of his face again, that is, that day?

A. No.

Q. In the store?

A. No.

Q. That is all you saw of him?

A. Right.

Remand Tr. 30–33. Her testimony at the second trial was identical:

*The Witness:* I just turned around and looked and I saw the gun and I turned my head back.

In contrast to observations of five, ten or fifteen minutes in prior cases,[20] Mrs. Neal had but a single over-the-shoulder glance at the alleged gunman.[21]

This single glance is not enough to support a finding of independent source. Accordingly, since the lineup at which Williams was identified was both unnecessarily suggestive *and* conducive to irreparable misidentification, the admission of identification testimony derived therefrom was constitutional error.

There remains only the question of whether this error was harmless. In addition to the testimony of Mrs. King, the Government's case consisted of two other witnesses who made in-court identifications of Williams. An examination of their testimony discloses that Mrs. Neal's identification not only contributed to the verdict, but was central to it.

James Newman was employed as a delivery man in the liquor store and testified that on the day of the crime he entered the store to pick up a delivery. He remained in the store for about a minute and recalled noticing two Negro males but did not see their faces. After leaving the store he went into an adjacent alley where his deliv-ery car was parked. At that point he heard a shot and, as he started moving back toward the store, two men ran past in the alley. Mr. Newman estimated that he observed their faces for about five or six seconds. One week later he attended the same lineup as did Mrs. Neal but was unable to identify Williams. He then made an in-court identification of Williams at trial, one year later.

The second identifying witness was James Wallace, a 12-year-old boy who was riding his bicycle in the vicinity of the robbery. He testified that he saw two men run from the alley, enter a car, and drive away. The boy could not identify Williams at a lineup, and did not testify at the first trial. At the second trial, coming some two years after the robbery, Wallace identified Williams for the first time.

The other evidence here amounts to two identifications which themselves bear many of the indicia of unreliability outlined by the cases and commentary.[22] Mrs. Neal's testimony thus the most important element of the Government's case and under no conceivable standard can its erroneous admission be deemed harmless.[23] Accordingly, I would reverse the conviction.

---

\*    \*    \*    \*    \*

*The Witness*: I just glanced at him like that—sideways.
Second Trial Tr. 500, 501.

20. *E. g.*, United States v. Kemper, *supra* note 16 (ten minutes); Hawkins v. United States, *supra* note 16 (ten minutes); Frazier v. United States, 136 U.S. App.D.C. 180, 419 F.2d 1161 (1969) (several minutes); United States v. Terry, 137 U.S.App.D.C. 267, 422 F.2d 704 (1970) (15 minutes); Bryson v. United States, 136 U.S.App.D.C. 113, 419 F.2d 695 (1969) (several minutes); Gregory v. United States, *supra* note 14 (three or four minutes); Williams v. United States, 133 U.S.App.D.C. 185, 409 F.2d 471 (1969) (six to ten minutes).

21. Moreover, in this same glance, she noticed the person was holding a gun. One need not be a trained psychologist to realize that during such a brief glance fear alone would draw one's attention to the gun rather than the face. *See* note 19 *supra*.

22. Here both witnesses had only brief periods of observations, failed to make an identification at a lineup, and then made courtroom identifications for the first time one and two years following the crime. *Compare* the factors listed in United States v. Wade, *supra* note 4, 388 U.S. at 241, 87 S.Ct. 1951 and the topic headings in Chapter IV ("Danger Signals" of erroneous identifications), P. Wall, Eye-Witness Identifications in Criminal Cases (1965).

23. Thus I need not resolve the dispute concerning the appropriate standard for determining harmless error in pre-*Stovall* cases. See Clemons v. United States, *supra* note 15, 133 U.S.App.D.C. at 51, 408 F.2d at 1254 (Wright, J. concurring in part and dissenting in part); Gregory v. United States, *supra* note 14, 133 U.S. App.D.C. at 3, 410 F.2d at 1022.

I do not understand my brethren to say that the Williams lineup was not suggestive; in any case the testimony on remand plainly shows that it was. The record also forecloses the possibility of arguing that the lineup was "necessarily" suggestive, that there was an independent source, or that the error was harmless. In fact, my brethren concede that the lineup would violate due process if held today. They justify affirmance solely on the ground that the lineup took place before the Supreme Court's decision in Stovall. The date of the lineup, of course, is not in question. What is in question, however, are the legal consequences which flow from that fact. On this score the majority's decision is completely silent. It overrules sub silentio our unanimous en banc decision in Clemons v. United States which unambiguously resolved the precise issue of Stovall's retroactivity in a fashion directly and unmistakably at odds with that applied today.

In Clemons our court recognized that Stovall gave "a significantly new dimension to the due process concept in relation to some police practices which have been long and widely engaged in without constitutional challenge." [24] And we gave weight to what the Supreme Court has termed a "reliance" interest [25] by prescribing different standards in pre- and post-Stovall cases. For post-Stovall cases, testimony relating to an unnecessarily suggestive pretrial identification is subject to a per se exclusionary rule. [26] For pre-Stovall cases, however, we held that the admission of even an unnecessarily suggestive pretrial identification would not be error if there existed an independent source

for the identification. [27] This limited incursion on the retroactivity of Stovall was consistent with the principal concern of Stovall: that where guilt depends upon an identification, the identification must be reliable. An identification based upon an independent source could be such "a reliable indicator of guilt," [28] to alleviate the danger of erroneous identification.

The Court today does not even purport to apply the Clemons' standards. We all agree that the Williams lineup was suggestive and no one has found— or indeed could find—an independent source. Thus, where Clemons created an exception to retroactivity where an identification meets Stovall's principal concern of reliability, the Court extends that exception to cover an identification which, measured either strictly by Stovall, or by the more lenient Clemons' standards, is patently unreliable.

But the Court's action not only contravenes controlling authority; it lacks even the comforting thought that there is reliable information that the accused —and not someone else—committed the crime charged. That we should strain in these circumstances to uphold an imprisonment for life is deeply troubling.

## II. No. 24,806—United States v. Coleman

Appellant Coleman also challenges the lineup identification of Mrs. Neal. After viewing the Williams lineup, Mrs. Neal was shown four photographs by the police for possible identification of the second man in the robbery. [29] She picked out the photograph of appellant Coleman. Ten days later, the Washington police learned that Coleman was in

24. 133 U.S.App.D.C. at 44 n. 21, 408 F.2d at 1248 n. 21.

25. 388 U.S. at 298–300, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

26. 133 U.S.App.D.C. at 34, 408 F.2d at 1237.

27. See note 16 supra.

28. 133 U.S.App.D.C. at 45, 408 F.2d at 1248.

29. Since the photographic presentation took place prior to appellant Coleman's arrest, no question of right to counsel under our recent decision in United States v. Ash, 149 U.S.App.D.C. 1, 461 F.2d 92 (1972) is raised. Additionally, appellant makes no contention that the photographic presentation is subject to due process infirmity.

custody in Baltimore on an unrelated charge. Mrs. Neal was then taken to Baltimore where she identified Coleman at a lineup composed of five Negro men, all of approximately the same height, weight and complexion. Appellant Coleman complains, however, that the other four participants in the lineup wore hats while Coleman was bareheaded; and that Mrs. Neal's prior description of the taller gunman indicated that he wore no hat.

I agree with the District Judge's conclusion on remand that "[t]he showing in a lineup of four individuals wearing hats, along with a fifth, who was the prime suspect in connection with a serious crime and who was bareheaded was clearly improper" [30] and unnecessarily suggestive. But I also agree that "under the circumstances of this case, that impropriety [did not] violate due process by creating any substantial likelihood that Coleman was incorrectly identified." [31] Several factors serve to insure that the improper lineup technique was not "conducive to irreparable misidentification."

In contrast to the single over-the-shoulder glance at the man she identified as Williams, Mrs. Neal had a full view of the taller gunman's face for almost the entire two to three minutes she was in the store after the gunmen entered. While certainly too short to itself constitute an independent source, it does provide an opportunity to observe which, taken together with other indicia of reliability—also absent in the Williams' identification—is sufficient. The crucial additional element here is that following her lineup identification of Williams, Mrs. Neal was shown four photographs in an attempt to secure a lead as to the identity of the second gunman. She immediately indicated the photograph of Coleman as that of the offender.

Given an adequate opportunity to observe and the spontaneous selection of the suspect's picture in a properly conducted photo-identification, I cannot say that the improper lineup procedure so tainted the witness's identification as to give rise to a substantial likelihood of misidentification. [32] As such, under the *Clemons*' standards applicable to pre-*Stovall* cases, the admission of Mrs. Neal's pre-trial identification of appellant Coleman was not error.

---

30. District Court Findings on Remand at 4.

31. *Id.; cf.* Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

32. *See e. g.,* Bryson v. United States, 136 U.S.App.D.C. 113, 118, 419 F.2d 695, 700 (1969); Clemons v. United States, *supra* note 15, 133 U.S.App.D.C., at 43, 408 F.2d 1246.