**UNITED STATES of America
ex rel. Richard ALBERTINI,
Petitioner,**

v.

**Superintendent, Wallkill Correctional
Facility, Mr. BUTLER,
Respondent.**

**No. 73 C 1616.**

United States District Court,
E. D. New York.

April 9, 1975.

Richard Albertini, pro se.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, Iris A. Steele, Asst. Atty. Gen., for respondent.

## MEMORANDUM ORDER

NEAHER, District Judge.

Petitioner, Richard Albertini, is presently incarcerated in the Wallkill, Correctional Facility, Wallkill, New York, serving an indeterminate sentence not to exceed ten years imposed on October 30, 1970, following his conviction by jury of the crime of robbery, second degree, in Supreme Court, Queens County. His conviction was unanimously affirmed without opinion by the Appellate Division, People v. Albertini, 38 A.D.2d 891, 330 N.Y.S.2d 766 (2d Dep't 1972), and leave to appeal to the Court of Appeals was denied on March 9, 1972 (Breitel, J.). Petitioner seeks a writ of habeas corpus from this court, alleging as the sole basis therefor a denial of constitutional rights respecting allegedly tainted in-court identifications of petitioner at his trial. This issue was among those presented on appeal, so there is no doubt petitioner has exhausted available State court remedies. See United States ex rel. Johnson v. Vincent, 507 F.2d 1309, 1313 (2 Cir. 1974).

The court, following the issuance of an order to show cause to the Attorney General of the State of New York, has received and reviewed the 400-page transcript of petitioner's four-day trial which commenced on February 2, 1970. The court is satisfied that this case presents no issue of material fact requiring an evidentiary hearing, 28 U.S.C. § 2243, and that, on the record presented, petitioner's application must be denied.

## I.

On the evening of March 16, 1969 and the early morning hours of March 17, when the crime of which he was convicted occurred, petitioner claimed to be with his wife at a neighborhood bar and grill called the Shamrock in Woodhaven Queens. Trial Transcript 220–21 (hereafter "Tr. ——"). Briefly, his story, corroborated in every significant detail by his wife's testimony, was that petitioner and his wife had left their Woodhaven apartment early in the evening of March 16th, taking their child to his wife's mother's house overnight. They went out to eat at a Queens restaurant, in celebration of his wife's birthday, and thereafter went directly to the Shamrock

where they stayed and drank from about midnight until 4:00 a. m. Then breakfast at a local diner was followed by a return home an hour or so later. No other witnesses were called to corroborate this story.

The State's case presented quite a different picture of petitioner's activities during the evening. No fewer than four eyewitnesses placed him at the scene of a restaurant and bar called the Long Island Hofbrau ("Hofbrau") in Elmhurst, Queens, at some point in the early morning hours of March 17, 1969. Taken as a whole, the State's case was simply that petitioner was one of three men who entered the bar as customers at around 12:30 or 1:00 a. m., stayed until closing time—about 3:00 a. m.—and committed an armed robbery of the bar, the proceeds of which were in excess of $6,000.

As of petitioner's trial, no other suspects had been apprehended for the crime. A review of the trial record makes it abundantly clear that the only issue in contention was the credibility of petitioner's alibi as matched against the eyewitness identifications at the scene of the crime. The State presented no other evidence which would tend to connect him with the crime.

A. *The Eyewitness Identifications at Trial*

Five persons present at the bar on the evening in question testified on the identification issue. Daniel Moran, owner and operator of the Hofbrau, was in the bar until 2:15 a. m. and saw three men enter the premises at about 12:30 a. m. Tr. 102, 105, 107. He could not recognize petitioner as one of the robbers, although "he looks like one of the men." Tr. 107.

Matthew Moran, one of the bartenders, worked the entire evening shift. He was introduced to three men by the other bartender and conversed with them for around 15–20 minutes at about 1:30 a. m. Tr. 110. When the holdup occurred, one of the three men, with a gun in his hand, ordered the people still in the bar into the men's room. Tr. 118. The witness identified this person in court as petitioner, later saying he had no doubt petitioner was a participant in the crime. Tr. 111, 118. The witness also testified concerning his opportunity to observe petitioner during the robbery itself. Tr. 113. He also spoke to him while at the bar, from two or three feet away. Tr. 124, 128. The witness later supplied a description to the police that the robber was around 32, 5'9"–5'10", 210–215 pounds, stocky, and that there was nothing unusual about his appearance. Tr. 125–28.

Eric Jones, the other bartender on the night shift, recalled three men entering the bar at around 12:30 or 1:00 a. m., and identified petitioner as one of them. Tr. 130. He had also seen petitioner there at about the same time a week earlier, Tr. 130, 137–38. He introduced the men to the other bartender, Matthew Moran, served them drinks over a two-hour period, and conversed with them, at times being within two feet of petitioner. Tr. 131–32, 142. At the time of the holdup, petitioner approached the witness with a gun, put it up to the right side of his head, and ordered him into the men's room. Tr. 135. After the holdup, the witness described the robber to the police as being of medium height, dark hair, light complexion, and dressed in a suit, with nothing unusual about his appearance. Tr. 143, 144. Jones also indicated he had had two or three drinks himself during the evening and had discussed the events with the other witnesses, but was sure petitioner was one of the three men who executed the holdup. Tr. 150–54.

Hugh McQuillan, the day bartender, was on the premises from about 1:00 a. m to 2:00 a. m., and recalled three men entering after his arrival. Tr. 155. He identified petitioner as one of them, testifying that as petitioner came in he "touched me to excuse himself to pass." Tr. 156. He added that every time he looked petitioner's way, he found peti-

tioner continuously watching him. Tr. 157. He had not seen the man before, and in response to a leading question as to whether there was "any doubt" in his mind that petitioner was one of the men he saw, replied: "He is one of the men I saw." Tr. 157. The witness had described the robber to police as a heavy-set man, approximately 5'10" wearing a blue suit. Tr. 158–59.

John Hust, a porter at the bar, went to work at about 1:00 a. m., but first saw petitioner at the time of the holdup. He was among those ordered into the men's room by petitioner. Tr. 163. In the men's room petitioner watched the occupants for about five minutes during the robbery, making various threats to them should anyone decide to talk Tr. 165–66. The witness also testified to having seen petitioner in the bar at 2:00 a. m the previous Sunday, when he had to get by him to reach an office key. Tr. 169. At closing time the previous week, the witness overheard a conversation among petitioner and two others which he interpreted as plotting to rob the bar. He warned the bartender and no holdup occurred. Tr. 170–71. In response to the same leading question asked of McQuillan, he testified: "This is the man." Tr. 171. He also testified that he was very close to petitioner just before the robbery and was very excited during it. He later described him to the police as stout, with dark hair. Tr. 176.

Detective Joseph E. Price of the New York City Police Department investigated the robbery and took down descriptions given him by witnesses. Within an hour of the crime, both Jones and Matthew Moran described the heaviest of the three mean as weighing 190 pounds, a 35-year old white male, dark hair, and wearing a tan sport jacket. Tr. 185–87. Neither witness reported anything unusual in their descriptions. Tr. 188–89. No discernible fingerprints were found during the processing of the bar. Tr. 205. Three days after the robbery Detective Price went back to the bar and again got descriptions from the witness-

es. The heaviest of the men was described by Jones and both Morans as an Italian male, 35, 5'7"–5'8", 170 pounds, receding black hair, round face, dark complexion, and wearing horn-rimmed glasses. Tr. 313–14.

There was also testimony from various witnesses as to descriptions of the other two men. Taken as a whole, it establishes that they were of noticeably slighter build than the man identified as petitioner. When placed on the stand petitioner testified that he was 5'7" and weighed 225 to 230 pounds at the time of the crime. Tr. 221–22. There was also evidence that petitioner had pronounced deformities in his front teeth at both the time of the crime and the trial. Tr. 222–23, 275, 294–95.

## B.  *The Wade-Simmons Hearing*

Prior to commencement of the trial, the trial judge conducted a hearing concerning the admissibility of various pre-trial identifications of petitioner made to police by most of the witnesses in this case. All of the aforementioned trial witnesses, except Daniel Moran, also testified at the hearing.

### 1.  *The Photographic Identification*

Price testified that Jones and both Morans were brought down to the Bureau of Criminal Identification and viewed in excess of 100 photographs. Daniel Moran was unable to identify anyone, but Matthew Moran, Jones, and Hust all subsequently picked out petitioner's photograph from a group shown to them. Tr. 3–5, 19–20, 26, 37–38. No further testimony was taken which shed any light on the fairness of the photographic identifications. Nevertheless, at the close of the hearing, the trial court ruled out of the State's case any reference to photographic identification. Tr. 80.

### 2.  *The Show-Up Identifications*

The major complicating factor in this case concerns a confrontation between petitioner and several of the eyewitness-

es at the Queens Criminal Court on April 24, 1969, sometime after the photographic identifications. Briefly, Detective Price, apparently focusing his investigation on petitioner, visited his house a couple of days earlier. Price saw only petitioner's wife and left a message for petitioner to call. He did, the same night, and an appointment was made for him to come into the detective squad on April 25, since Price represented he would be unavailable the preceding two days. Price, however, aware of petitioner's scheduled appearance in court on another matter for April 24, arranged to have the State's witnesses see him at the courthouse that day, thereby effecting petitioner's arrest and obviating the April 25 appointment. Tr. 51–57.

Without detailing the identification procedure, suffice it to say that Matthew Moran, Jones and McQuillan all identified petitioner at that time under circumstances which were a far cry from the type of line-up that might have been conducted the following day. Nor was any exigency presented to show why standard identification procedures were not possible. At any rate, the trial court ruled out of the State's case any identification of petitioner at the courthouse. Tr. 80.

### 3. *The Judge's Ruling*

In ruling out the State's evidence on pre-trial identification, the judge made no findings of any kind and did not specify the basis for his ruling, except to state:

> "I don't think that what happened after the event taints the identification that can be testified to, but I do say that the ruling of the Court is to the effect that I will not allow the People, as part of their case in chief, to offer any testimony as to what happened after the events in the Hofbrau on identification. In other words, you are precluded from asking any witness as to whether he saw this defendant in the courtroom or saw pictures of him.

> \*　\*　\*　\*　\*　\*

> ". . . you will be limited to the testimony of your witnesses as to the occurrences in the Hofbrau House. The rest is suppressed as far as the People are concerned.

> \*　\*　\*　\*　\*　\*

> "I take the position that what happened after the event does not taint what could be testimony of identification for the jury here to hear. I so rule." Tr. 79–81.

At that point in the proceedings, before the extensive identification evidence at trial was adduced, the factual basis for such a ruling was slim indeed. Jones, Matthew Moran and Hust had testified only to being "present" when the robbery occurred. Tr. 18, 25, 35. Moran added that in the courthouse he identified petitioner "right away", Tr. 31, and that he had seen petitioner "[o]nly on the night of the robbery." Tr. 34. Jones and Hust also appeared to make in-court identifications at the hearing. Tr. 21, 37–38, 41. Hust stated he saw petitioner a week before and also the night of the robbery. Tr. 39.

In colloquy it was also established that no witness ever told the authorities, after looking at petitioner or his picture, that he was not the man. Tr. 45. McQuillan testified that he recalled three men entering the bar but was not there when it was robbed, Tr. 47–48, and he recognized petitioner as one of the men. Tr. 50.

### II.

With that background, the difficulties with this case become apparent. A great deal has been written on pre-trial identification problems since the seminal cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Yet troublesome questions remain in the application of the independent origin rule of *Wade* that where the illegality of the pre-trial identification procedure is established, the State

bears the burden of showing by clear and convincing evidence that the in-court identification was based upon independent observations of the suspect not tainted by those procedures. United States v. Wade, *supra,* 388 U.S. at 240–41, 87 S.Ct. 1926, 18 L.Ed.2d 1149; United States ex rel. Whitmore v. Malcolm, 476 F.2d 363, 365 n. 2 (2 Cir. 1973); United States ex rel. Robinson v. Vincent, 371 F.Supp. 409, 415–16 (S.D.N.Y.), aff'd, 506 F.2d 923 (2 Cir. 1974).

Here, petitioner having failed to establish any unfairness in the photo identification procedure, the suppression hearing was directed primarily toward resolving the illegality question surrounding the courthouse show-up. Then, inexplicably, the trial court ruled out all such evidence but found the eyewitness identifications untainted without there having been, *at that point,* any significant testimony on the many factors which would bear on that issue. Such a procedure would obviously not comport with this rather explicit statement from Gilbert v. California:

> "The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error."

388 U.S. at 272, 87 S.Ct. at 1956 (citing *Wade*). See also Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1237, 1251, 1253 (1968) (main, concurring and dissenting opinions); United States v. Sutherland, 428 F.2d 1152, 1155 (5 Cir. 1970); United States v. Driscoll, 454 F.2d 792, 800 (5 Cir. 1972).

In this case, of course, such a determination was arguably made. Tr. 81. But the nature of that determination presents yet another question: may a factually unsupported finding of independent origin *at the hearing* nevertheless be cured by subsequent testimony *at the trial?*

This Circuit has not explicitly discussed the question or reviewing the trial record in the circumstances presented by a case such as this. In United States ex rel. Gonzalez v. Zelker, 477 F.2d 797, 803–04 (2 Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 254, 38 L.Ed.2d 158 (1973), the court found it proper to consider evidence adduced at trial, but it was not made clear whether there had been a pre-trial identification hearing. See also United States v. Kahan, 479 F.2d 290, 294 (2 Cir. 1973), rev'd on other grounds, 415 U.S. 239, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974). Cf. United States ex rel. Cannon v. Montanye, 486 F.2d 263 (2 Cir. 1973), cert. denied, 416 U.S. 962, 94 S.Ct. 1982, 40 L.Ed.2d 313 (1974); United States ex rel. Rivera v. McKendrick, 448 F.2d 30 (2 Cir. 1971). These decisions may be read as implying that it is proper for a court to determine the independent origin question on the basis of the entire record when it is adequate for that purpose.

■ Other federal courts, exercising appellate review over federal convictions and review of State court decisions in applications for a writ of habeas corpus, have consistently held that where the record is adequate to reach such a conclusion, a reviewing court may make a finding of independent origin on the basis of the entire record. Souza v. Howard, 488 F.2d 462, 468 (1 Cir. 1973), cert. denied, 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974); United States ex rel. Harris v. State of Illinois, 457 F.2d 191, 195–96 (7 Cir.), cert. denied, 409 U.S. 860, 93 S.Ct. 147, 34 L.Ed.2d 106 (1972); United States v. York, 138 U.S.App.D.C. 197, 426 F.2d 1191, 1193 (1969); Hawkins v. United States, 137 U.S.App.D.C. 103, 420 F.2d 1306, 1307 (1969). Many cases have held to the same effect in situations where it appears that no hearing had been held outside the presence of the jury. United States v. Johnson, 461 F.2d 1165 (5 Cir. 1972); Parker v. Swenson, 459 F.2d 164 (8 Cir. 1972), cert. denied, 409 U.S. 1126, 93 S.Ct. 943, 35 L.Ed.2d 258 (1973); United States v. Driscoll, *supra,* 454 F.2d at 799–800; Butler v.

Robbins, 434 F.2d 1009 (1 Cir. 1970); Williams v. United States, 133 U.S.App. D.C. 185, 409 F.2d 471 (1969).

Adopting such an approach and viewing the record as a whole, the court is satisfied that had the question of independent origin been fully litigated at the pre-trial hearing, the outcome would have no doubt been the same. Weighed against the overwhelming testimony of several eyewitnesses with a remarkable opportunity to view petitioner for a lengthy period before or during the commission of the crime are only a few much less significant discrepancies between the descriptions given at the time and his actual description. The trial court would have been entirely justified in concluding, had this evidence been adduced at the pre-trial hearing, that the State had met its burden of clear and convincing evidence of independent origin on the basis of these and other relevant factors. See Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); United States ex rel. Robinson v. Vincent, *supra*, 371 F.Supp. at 416.

Had petitioner been afforded a full pre-trial review of the independent eyewitness testimony against him, he would have found himself in no different circumstances before the jury. Faced with eyewitness identifications ruled to be untainted, he would still have had to decide whether or not to buttress his alibi by inquiry into the suppressed pre-trial identification evidence in an effort to convince the jury that the in-court identifications were suspect. Thus the trial court's unsubstantiated finding of independent origin did not deprive petitioner of a fair trial—the critical question here—and the court is satisfied that the error was harmless beyond a reasonable doubt. See United States ex rel. Phipps v. Follette, 428 F.2d 912, 916–17 (2 Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Petitioner's application for a writ of habeas corpus is denied and it is

So ordered.