Anthony J. **MONTEIRO**, Petitioner,
Appellant,

v.

Philip J. **PICARD**, Superintendent of the
Norfolk Prison Colony, Norfolk, Mas-
sachusetts, Appellee.

No. 71–1015.

United States Court of Appeals,
First Circuit.

Heard May 4, 1971.

Decided May 26, 1971.

As Amended on Denial of June 29, 1971.

Charles M. Burnim, Marblehead,
Mass., by appointment of the Court, for
appellant.

Henry F. Spaloss, Asst. Atty. Gen.,
with whom Warren B. Rudman, Atty.
Gen., was on brief for appellee.

Before ALDRICH, Chief Judge, Mc-
ENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

On May 9, 1967, six months after
their home had been robbed, Alice and
Emile Chagnon identified petitioner at a
police station line-up as one of two men
who committed the crime. Douglas
Plummer, a 14 year old boy who briefly
saw the robbers fleeing the scene, made
the same identification. Six weeks later
the three witnesses repeated their iden-
tification at a joint trial in the Superior
Court of New Hampshire. A jury ver-
dict of guilty was returned against both
defendants, and the convictions were up-
held on appeal to the New Hampshire
Supreme Court. State v. Monteiro, 110
N.H. 95, 261 A.2d 269 (1970). After a
full evidentiary hearing, the federal dis-
trict court denied petitioner's request for
habeas relief and this appeal followed.

Petitioner contends that his state
court conviction was constitutionally
flawed by the in-court identification
made by the three witnesses based on an
impermissibly suggestive line-up.[1] The
State Supreme Court, although recogniz-

---

1. The line-up in question occurred prior to
the Supreme Court's decisions in United
States v. Wade, 388 U.S. 218, 87 S.Ct.
1926, 18 L.Ed.2d 1149 (1967) and Gil-
bert v. California, 388 U.S. 263, 87 S.Ct.
1951, 18 L.Ed.2d 1178 (1967), which
were made non-retroactive by Stovall v.
Denno, 388 U.S. 293, 87 S.Ct. 1967, 18
L.Ed.2d 1199 (1967). Under Stovall v.

Denno, *supra* at 302, 87 S.Ct. at 1972,
a court in determining the admissibility of
an in-court identification must look to the
"totality of the circumstances" surround-
ing the line-up procedure and examine
whether it was "so unnecessarily sugges-
tive and conducive to irreparable mis-
taken identification that [petitioner] was
denied due process of law."

ing deficiencies in the line-up procedure employed, found the procedure as a whole to fall within the range of permissibility. The federal district court assumed the line-up "unduly suggestive" as to Mr. Chagnon and the Plummer boy, but found the same procedure "probably permissible" as to Mrs. Chagnon,[2] whose identification was based, in any case, on an independent source, i. e., her observations during the robbery. In the light of Mrs. Chagnon's admissible identification together with other evidence presented at trial, the district court held that the admission of the other two identifications was harmless error.

To aid us in analyzing the identification issue, we can divide the events surrounding the line-up into three periods: those events which transpired prior to the line-up; the actual line-up procedure itself; and the post-line-up conference. The district court found, and the petitioner does not contest on appeal, that on the trip to the Manchester police station Lt. Inspector Barry made no statements to the three witnesses which could have prejudiced petitioner's rights. "[T]here was no talk about anything more significant than the hat Mrs. Chagnon was wearing." The officer indicated to the three only that they were to view a line-up and make an identification if possible. He did not suggest or infer that the police had "found the man" or indicate in any way which line-up participant should be considered in particular.

■ Arriving at the jail, the three witnesses were led into a wire mesh cage to observe a three-man line-up approximately 15 feet away. Petitioner, wearing a white shirt and dress slacks, stood between two men, one being of petitioner's height and wearing blue prison trousers and a T-shirt, the other shorter than petitioner, wearing blue prison trousers and a blue shirt. At the request of the police each line-up participant gave his name and address, turned to the side, the back, the other side and the front. After observing the line-up for 3 to 5 minutes, the witnesses were taken into an adjoining room. Petitioner suggests that this line-up was "unduly suggestive", but we cannot agree. The effect of the dress of the participants is difficult to assay; the civilian dress of petitioner could have indicated equally that he was recently arrested or merely taken off the street for purposes of variety in the line-up. There is no indication that the petitioner was made prominent by either racial or other physical characteristics. *Cf.* United States v. Wade, 388 U.S. 218, 232, 233, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). We find that the line-up procedures employed, although less than ideal, did not transgress constitutional limitations. As we said recently in Cooper v. Picard, 428 F.2d 1351, 1352 (1st Cir. 1970), "Some latitude must be allowed to the police, at least in the absence of deliberate theatrics."

In the adjoining room the three witnesses were asked in turn by the police officer whether they could make an identification. Mrs. Chagnon, who was asked first, identified petitioner. Mr. Chagnon did likewise and Douglas Plum-

2. The district court was especially impressed with the testimony given by Mrs. Chagnon at the evidentiary hearing. It found that this witness had "a strong and accurate memory" and characterized her "as one not easily to be persuaded to make an identification just because she was brought to view a lineup." Such a demeanor gloss on the stark testimony of a transcript must, of course, be given weight by an appellate court. Underscoring the district court's characterization of Mrs. Chagnon was her dramatic performance at trial in an identification experiment. The defense produced seriatim three men, their heads covered with stocking masks, and asked Mrs. Chagnon to view them briefly. Following a recess, the three, unmasked, were brought back into court together and the witness correctly placed them in the order of their first appearance. As defense counsel acknowledged in his closing argument, she "batted one thousand".

mer concurred. Both Mr. Chagnon and the Plummer boy had heard Mrs. Chagnon's identification before making their own. The officer then informed them they had selected the right man.

The district court found, and we agree, that the post-line-up conference tainted the in-court identification made by Mr. Chagnon and the Plummer boy.[3] They were asked to express their choice only after hearing Mrs. Chagnon positively identify the petitioner as one of the robbers. The district court's characterization of Mrs. Chagnon as a strong personality is also relevant to the impression her prior identification would make on a young boy and her aging husband. *See*, J. Quinn, In the Wake of Wade, 42 U.Colo.L.Rev. 135, 153 (1970). This flaw, however, cannot taint Mrs. Chagnon's identification. Her choice was certain and unwavering. Although it was perhaps reinforced by the concurrence of her two companions and the police's affirmative acknowledgement, the identification was made prior to these possibly suggestive influences. *Cf.* Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). Examining the identification procedure as a whole, we conclude that Mrs. Chagnon's in-court identification passes constitutional muster and was properly admissible.

Our next problem is determining whether the admission of the two tainted identifications was reversible error. The evidence against petitioner was overwhelming. One witness, a Mrs. Caroline Morse, testified that petitioner had confessed the crime to her shortly after its occurrence.[4] The furs stolen from the Chagnon residence and a gun were found by Mrs. Morse in her apartment the night of the robbery. The two defendants came the next day to recover the gun and return the witness' car which they had borrowed the night before. A car similar to that borrowed from Mrs. Morse was seen by the Plummer boy and another witness, a neighbor of the Chagnons, parked down the street from the Chagnons' residence the night of the robbery. A few weeks later the petitioner's co-defendant moved the stolen furs from Mrs. Morse's apartment to the apartment of Jean Abernathy, who also testified at trial. In its closing argument the prosecution discounted the importance of the eyewitness identifications and stressed the Morse and Abernathy testimony as to events occurring after the robbery.

Substantiating these witnesses' testimony was testimony by petitioner's co-defendant that he indeed did borrow the Morse car on that evening (presumably to drive petitioner to another city), and also that he did bring furs (which he said a third party had given him to try to sell) first to the Morse apartment and then later to the Abernathy apartment. Petitioner's asserted alibi that he was on a date that evening in either Beverly or Revere was uncorroborated. The district court was correct when it found that the admissible evidence was "almost certain to have produced a conviction." From the record before us, we "are able to declare a belief that [admission of the two tainted identifications] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24,

---

3. The district court assumed, in addition, that these two identifications were not based on a source independent of the jail line-up. The evidence presented at trial supports that assumption: the Plummer boy viewed the two robbers on the night of the crime from across a poorly lit street for a brief moment; Mr. Chagnon repeatedly testified at trial that he did not "observe" the robbers during the commission of the crime.

4. Petitioner in his brief made much of the fact that Mrs. Morse's testimony as to petitioner's confession was elicited by leading references by the prosecution as to what "they" said or did. To the contrary, the witness was asked specifically: "Who said those things?" Mrs. Morse responded: "Fred Monteiro and Chuckie [the two defendants]. Both of them." A jury could properly find that petitioner had admitted his participation in the robbery.

314

87 S.Ct. 824, 828, 17 L.Ed.2d 705
(1967); Harrington v. California, 395
U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284
(1969).

Affirmed.