UNITED STATES of America ex rel. Carl M. ROBINSON, Petitioner,

v.

Leon J. VINCENT, Superintendent, Green Haven Correctional Facility, Stormville, New York, Respondent.

No. 71 Civ. 1997.

United States District Court, S. D. New York.

Jan. 31, 1974.

As Amended March 6, 1974.

Stephen A. Marshall, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, New York City, for respondent; Stanley L. Kantor, Deputy Asst. Atty. Gen., of counsel.

## OPINION

COOPER, District Judge.

Petitioner, now serving a sentence of eight and one-third years to twenty years imposed under a judgment of conviction entered in February 1970 for robbery in the first degree [1] following a jury trial in the Supreme Court of the State of New York, seeks his release upon a writ of habeas corpus. He alleges that the pre-trial identification procedures used by the police at the time of arrest violated his Sixth Amendment right to counsel and his Fourteenth Amendment right to due process of law.

Petitioner's judgment of conviction was affirmed by the Appellate Division, First Department, on February 25, 1971; leave to appeal was denied by the Court of Appeals on April 7, 1971. On December 15, 1971, petitioner's pro se application for a writ of habeas corpus

---

1. Petitioner was also convicted on related counts of grand larceny in the third degree, possession of a weapon and assault in the first degree. He was sentenced to concurrent lesser terms on these counts.

was denied by this Court without a hearing. On January 21, 1972, this Court granted petitioner's application for a certificate of probable cause and for leave to proceed on appeal in forma pauperis, and appointed counsel to represent petitioner on appeal. On September 28, 1972 the Court of Appeals reversed the denial of the application, holding that petitioner was deprived of his Sixth Amendment right to counsel at a show-up conducted on the night of the arrest. United States ex rel. Robinson v. Zelker, 468 F.2d 159 (2d Cir. 1972), cert. denied, 411 U.S. 939, 93 S.Ct. 1892, 36 L.Ed.2d 401 (1973) (hereafter "468 F.2d at —"). The matter was remanded for an evidentiary hearing on the question whether " . . . there was an impermissible taint to the in-court identification . . . ." 468 F.2d at 165. This Court held an evidentiary hearing (hereafter "the Hearing") on May 29, 30 and June 11, 19, 20, 21, 1973.

After careful scrutiny of the testimony adduced at the Hearing and the papers submitted in conjunction therewith, we conclude that the application is devoid of merit and must be denied.

**I**

The events which grounded the prosecution took place in broad daylight in Manhattan at 11:30 A.M. on May 3, 1968. Daniel Greenberg had just obtained a blue airline bag of coins totalling some $80 from the Manufacturers Hanover Trust Company at 8th Avenue and 44th Street in Manhattan and was returning to his parking lot on West 46th Street when he was shot in the back by an assailant who picked up the bag with the money. At the trial, one eyewitness, an engineer named Schumann observed the assailant hold the gun, grab the bag and run to and enter a small white car. Another passerby, Barcelo then testified he observed a white Mercury Cougar stop at the intersection of 8th Avenue and 46th Street. A "commotion" followed on the

street whereupon Barcelo observed a man enter the Cougar which was then stopped on the northeast corner of 8th Avenue across 46th Street. Neither Schumann nor Barcelo identified petitioner at trial. See 468 F.2d at 161.

The only witness who identified petitioner at trial was Patrolman Ferdinand Voltaggio, a police officer assigned to the Parking Enforcement Squad. At the moment of the crime, Voltaggio was in a tow truck stopped at the 46th Street stop light on 8th Avenue in the furthest west traffic lane. Voltaggio testified that when he heard the shot, he looked to his left (Tr. 12)[2] in the direction from where the sound of the shot came and saw the assailant standing over Greenberg's body. At that moment the assailant was some 50 feet from Voltaggio who was able to look at him full face (Tr. 559). The assailant thereupon picked up the bag and ran to the opposite corner of 46th Street. When he reached that corner, he had traversed a distance of 50 feet and was then within 25 feet of Voltaggio who remained in his tow truck (Tr. 559-561). The assailant was then directly across the street from the truck. Voltaggio's attention thereupon was momentarily distracted by the honking of horns. When Voltaggio refocused upon the assailant, he was still at the opposite corner of 46th Street, some 25 feet from Voltaggio, waiting to cross 8th Avenue (Tr. 559-561; 566). The assailant then traversed another 50 feet as he crossed 8th Avenue; jumped into the Cougar, occupied by two men, and drove north on 8th Avenue.

Voltaggio pursued the Cougar in his tow truck, both vehicles going through red lights at Broadway and 7th Avenue. The Cougar became enmeshed in traffic at 6th Avenue, whereupon the assailant jumped from the car and fled towards 6th Avenue. Voltaggio, whose tow truck was several car lengths behind the Cougar, jumped from his truck and from a

---

2. "Tr." followed by a number refers to a page of the transcript of the evidentiary hearing held before this Court.

distance of 30 to 40 feet (Tr. 573) observed the assailant fleeing. Voltaggio was again able to view the assailant's face as he emerged from the Cougar. He did not pursue the assailant who escaped, but apprehended the two men remaining in the Cougar, the Pyles brothers.

The testimony is in conflict as to the length of the various periods during which Voltaggio viewed the assailant. Voltaggio testified at the State trial that he viewed the assailant's face for about 14 seconds as he ran across 8th Avenue in front of the tow truck. The Court of Appeals reduced this to approximately four seconds, taking judicial notice "that a man running only 10 miles per hour, half the speed of a sprinter, can cover about 15 feet per second." 468 F.2d at 162. See also 468 F.2d at 164. However, the testimony adduced at the Hearing indicates strongly that while Voltaggio did not have as much as 14 seconds to observe the assailant, he did have more than four. He observed the assailant twice traverse a distance of 50 feet; the first time when he ran in front of the tow truck to the opposite corner of 46th Street, at which point Voltaggio's attention was momentarily diverted by the noise of traffic, and then another 50 feet as the assailant crossed 8th Avenue and jumped into the Cougar. Moreover, Voltaggio testified that in the interim between these two distances, the assailant stood still for "a couple of seconds" (Tr. 566), probably waiting for an opportunity to cross the Avenue. Relying upon this testimony and using the method of calculation suggested by the Court of Appeals, it appears that Voltaggio's opportunity to observe the assailant lasted between 7 and 10 seconds, and we so find.

Voltaggio further testified before us that he searched the Cougar and found the blue airline bag carried by Greenberg and a Hertz rental agreement which included a notation that the car had been rented the day before by petitioner and bore his home address.

## II

Voltaggio thereupon brought the Pyles brothers to the 18th Precinct where their arrest was processed by Detective Matthew Horan. Voltaggio gave the Hertz agreement to Horan as well as a description of the escaped assailant. Acting upon that description, Horan sent out a police alarm which described the assailant as an "unknown male Negro, 25 years old, 5'-7", 150 lbs, brown complexion, dark shirt and jacket, dark pants" (Tr. 72–76; 188; 310–313). Horan testified at the Hearing that the alarm included everything that Voltaggio gave him regarding the assailant (Tr. 188).

On the night of the crime, Horan, acting upon the name and address contained in the Hertz agreement, went to petitioner's home where he found Odessa Chambers, petitioner's girl friend and later his wife, and brought her to the station house. A hearing on an application for a complaint and warrant was held. There and then Horan, Chambers and Voltaggio testified in the presence of each other (HM 2–15A).[3] On that occasion Horan testified as to the events surrounding the robbery, that he had a description of the assailant obtained from Voltaggio and that based upon the information then available he concluded that petitioner was the assailant. Chambers testified next, describing petitioner as being 4 or 5 inches taller than her own 5 feet 2 inches, that he was "brown skinned" and when last seen was wearing a black suit with blue tie and light shirt, black shoes and no hat, but that he could have been wearing a "light colored pair of pants, too." See 468 F. 2d at 162. Voltaggio then testified as to what he had seen. He described the assailant as a "brown skinned, Negro, he was about 5–7 or 5–8, he had a dark

---

3. "HM" followed by a number refers to a page of the minutes of the Warrant Hearing. Those minutes, dated May 3, 1968, were introduced into evidence at the Hearing before us as Exhibit 8.

jacket and . . . light pants" and no hat. See 468 F.2d at 162. Upon the strength of that total testimony a complaint and arrest warrant were issued, charging petitioner inter alia with robbery and assault.

### III

On the evening of the day after the crime, Horan arrested petitioner at his home and brought him back to the 18th Precinct in Manhattan where he was booked. Horan summoned Voltaggio to the precinct a few hours later for the purpose of identifying the assailant. Horan met Voltaggio at the entrance to the squad room where petitioner was seated at a desk. A brief conversation ensued wherein Horan asked Voltaggio, "Freddie, is this the perpetrator," to which Voltaggio responded, "Yes, that's him" (Tr. 108; 230; 345).[4]

Petitioner's version of what happened in the squad room differs significantly from that offered by Voltaggio and Horan. Petitioner claims that he was twice displayed before a one-way mirror by the police in a room other than the squad room (Tr. 412–423) and that only thereafter did Voltaggio enter the squad room and speak to Horan (Tr. 424–426). Petitioner claims that his version is corroborated by the fact that he was able to draw a diagram of the mirror room which he prepared prior to the Hearing in the presence of his counsel (Tr. 412–413; 430–434) and which by Horan's own admission was an accurate description of the room in which the one-way mirror was located in May, 1968 (Tr. 267–269). Petitioner contends that had he not been brought into the mirror room, he would have been unable to draw an accurate diagram of that room. Moreover, as the Court of Appeals noted, use of a mirror suggests a degree of uncertainty about Voltaggio's identification; this would be consistent with the fact that Horan showed Voltaggio a photograph of petitioner at his arraignment, the necessity for which does not otherwise appear (STM. 198–199).[5] See 468 F.2d at 164, 163 n. 7.[6]

After careful scrutiny of the testimony relevant to this issue, we conclude that petitioner's version of the show-up must be rejected. Whether or not a mirror was used is a fact of paramount significance, particularly in light of the extensive use thereof suggested by petitioner, one which no knowledgeable participant would be likely to forget. Horan and Voltaggio are of one mind that no mirror was used during the show-up and that Voltaggio's identification of petitioner was immediate and without any uncertainty. As to these issues, there is neither contradiction nor hesitancy. Though there are inconsistencies in Voltaggio's testimony regarding other de-

---

4. There is some discrepancy as to the exact wording of Horan's question. At a meeting with the Assistant Attorney General Representing the State at the Hearing, held on October 18, 1972, Voltaggio stated that Horan met him when he first entered the precinct and said, "Come upstairs . . . we have a fellow I would like you to see. I would like you to see if this is the fellow who did the shooting" (Tr. 115). Moreover, Voltaggio testified that he, Horan and petitioner were the only people in the room (Tr. 122) whereas Horan testified that two other white detectives were also present. (Tr. 230; 358–359). Finally, it should be noted that Voltaggio told the Assistant Attorney General at their October meeting that he had identified petitioner from a line-up and not from a show-up (Tr. 113–116). At the hearing, however, Voltaggio recanted his statements regarding a line-up (Tr. 116) ex-

plaining that he had confused the events of that evening with another identification procedure wherein a lineup was in fact used some two weeks earlier (Tr. 118).

5. "STM." followed by a number refers to a page of the State Court Trial minutes. Pursuant to stipulation, the trial minutes are a part of the record before this Court.

6. It should be noted that at the Hearing Voltaggio testified that he was not shown any photographs at the arraignment; that Horan did show him two photographs at a hearing conducted at St. Vincent's Hospital several months after the arraignment (Tr. 37–39; 120; 126–131). This testimony was erroneous, for Horan was not present at the hospital hearing (Tr. 356–357) and therefore could not possibly have exhibited photographs of petitioner to Voltaggio on that occasion.

tails of the pre-trial procedure, they are typical of human frailties consistent with an honest witness whose candor and effort at recollection were clear and undeniable. From our vantage point, this witness scored high.

Moreover the Hearing was held some five years after petitioner's arrest and even the State trial did not commence until more than 21 months after the shooting. Testimonial inconsistencies regarding these events are inevitable after such a lapse of time and they cannot be relied upon to challenge the testimony of Voltaggio and Horan regarding use of a mirror, as to which, we emphasize, there was neither uncertainty nor contradiction. Whereas neither Voltaggio nor Horan had any motive to falsify regarding use of a mirror, petitioner must have been aware that if he could establish its use at the show-up, his case would be greatly strengthened. As to his knowledge of the layout of the so-called mirror room, it could as easily have been derived from his passing through the room or even his being seated therein at a time other than that during which he was identified by Voltaggio. There is nothing before us to the contrary. Accordingly, we find no persuasive reason to accept the diagram as proof that Voltaggio observed petitioner through a mirror before identifying him as the assailant.

Petitioner's testimonial expression was in marked contrast to that of Voltaggio; a certain shrewdness and cunning substituted for candor. His demeanor as a witness was suggestive of meticulous preparation and rehearsal prior to trial [6a] and his testimony smacked too much of a prepared and expected call of triumph, "Now I got you!" In the main, it is clear that petitioner took great liberties with the truth; he was not convincing and we find ourselves duty bound to reject his testimony.

In the last analysis, in the pursuit of truth we are confronted here with a fre-quent setting—written or documentary proof totally absent, we are compelled to extract and weigh, from the totality of oral proof, the fragments as well as large segments of evidence bearing upon the factual issues for resolution, and to employ, among other factors, a discerning eye in "sizing up" each witness. We strictly apply to ourselves the same criteria and cautions about the testimony of witnesses that we include in our charge to juries:

> The greatest challenge to you is your evaluation of the testimony as it came from the lips of witnesses and your estimate of the exhibits and the stipulations. It is your total evaluation of the testimony given by the witnesses, and each of them, that is controlling, not that advanced by the attorneys or suggested by anybody. You are the sole judges of the facts and you have no greater burden than the accurate recognition of what really counts in the totality of that testimony.

> In examining the witnesses who took the stand, in sizing them up, in your search for the truth, you should be guided by your plain every day common sense. You saw each witness, you observed the manner of his giving testimony. What degree of credit you should give a witness' testimony should be determined by his conduct, his manner of testifying, his relation to the controversy, his bias or impartiality, and the reasonableness of his statements. In other words, what you try to do, to use the vernacular, is to size up a person, just as you would in any important personal matter when you undertake to determine whether or not a person is truthful, candid and straightforward.

> The testimony of any witness whose self-interest is regarded convincing to you is to be considered with great caution and weighed with great care. Accordingly, you will consider whether the testimony was inspired by self-

---

**6a.** Needless to add, his attorney of course had no part whatever in this (see Point IX of this Opinion).

interest, personal advantage, hostility or whatever other human factors may be involved. You should consider whether the testimony of such a witness was a fabrication induced by a promise or even a belief that he did or will receive favorable consideration of one kind or another. Likewise, it is for you to decide whether a defendant's testimony points to his innocence or is in part or in whole a tissue of lies.

You should consider the witness' intelligence, motive, state of mind and demeanor while on the stand. You should consider his candor, or lack of candor, his possible bias, his means of information, and the accuracy of his recollection.

You have heard a number of versions of events which are in sharp conflict. Indeed, it is evident that the nature of the contradictions suggests that the differing versions are not always the result of inadvertence or faulty recollection.

Truth comes from the most unlikely sources. Those from whom we rightfully expect the truth, very often we find it not forthcoming, and those from whom we would hardly expect it, from them sometimes a veritable avalanche of convincing disclosure gushes forth.

Thus, out of the welter of testimony, you are called upon to determine the factual issues in the case and resolve the conflict.

Carefully applying this measurement, we are satisfied by a fair preponderance of the credible evidence that the truth lies with Voltaggio and not with petitioner. We find Voltaggio a simple man, with a simple vocabulary, with respect for truth, whereas there was patently absent in petitioner's testimony the ring of truth.

We also bear in mind another part of our charge to juries:

I instruct you that it is the law that interest creates a motive to give false testimony, that the greater the interest, the stronger the temptation, and that the interest of a defendant in the result of a trial is of a character possessed by no other witness and is therefore a matter which may affect the credence which shall be given of his testimony.

However, let me point out that the fact a defendant has such an interest in the case does not mean that he will testify falsely. It is for you, the jury, to decide whether he testified truthfully and how much weight to give to his testimony.

Clearly, of all the witnesses called petitioner has the greatest interest in the outcome of this proceeding.

Petitioner was arraigned on May 5, 1968 (Tr. 354–355). Voltaggio testified at the Hearing that he was not present at the arraignment. (Tr. 124). At the state trial, however, Voltaggio stated that he was present at the arraignment and there viewed petitioner in the custody of Horan (S.T.M. 192–3; 324). Moreover both Horan and petitioner testified at the Hearing that Voltaggio was in fact present (Tr. 355; 438–441). As stated above, it was at the arraignment that Horan showed petitioner's photograph to Voltaggio. No reason for Voltaggio's presence at the arraignment is apparent from the record, and Voltaggio could offer none when asked (S.T.M. 192). See 468 F.2d 164, 163 n. 3. While we entertain uncertainty on this point, we are satisfied that at most Voltaggio may have been honestly mistaken about it.

## IV

The issue before us is whether the pre-trial identification process set forth above should have precluded Voltaggio's in-court identification of petitioner. Whereas here the illegality of the pre-trial identification procedure is already established because petitioner was deprived of his right to counsel, the State bears the burden of establishing by clear and convincing evidence that the in-court identification was based upon

observations of the suspect other than during pre-trial identification procedures; that the in-court identification had an independent origin and was not tainted by the prior illegal procedures. United States v. Wade, 388 U.S. 218, 240–241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). See Cooper v. Picard, 428 F.2d 1351, 1353–1354 (1st Cir. 1970), on remand, 316 F.Supp. 856 (D.Mass.1970); United States v. Zeiler, 427 F.2d 1305, 1309 (3rd Cir. 1970). The proper test to be applied is:

> " '[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

United States v. Wade, *supra*, 388 U.S. at 241, 87 S.Ct. at 1939. See Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In applying this test, the Court has set forth several factors which must be considered, including the following: (1) "prior opportunity to observe the alleged criminal act"; (2) "the existence of any discrepancy between any pre-line-up [or show-up] description and the defendant's actual description"; (3) "identifi-

cation prior to line-up [or show-up] of another person"; (4) "the identification by picture of the defendant prior to the line-up [or show-up]"; (5) "failure to identify the defendant on a prior occasion"; (6) "the lapse of time between the alleged act and the line-up [or show-up] identification"; (7) "those facts which, despite the absence of counsel, are disclosed concerning the conduct of the line-up [or show-up]". United States v. Wade, *supra*, 388 U.S. at 241, 87 S.Ct. at 1940. It should be noted, however, that this list is not exhaustive and, in the context of the instant proceedings, there are other factors which must be considered such as "the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." United States v. Wade, *supra*, 388 U.S. at 228, 87 S.Ct. at 1933. Hence the nature of the police station confrontation must be considered in reaching a conclusion as to independence of recollection of a witness subject to it.[7] See Cooper v. Picard, *supra*, 428 F.2d at 1354. Cf. Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1244–1246 (1968) (en banc), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

---

7. A somewhat similar list of criteria which we found helpful is the following:

1. Was the defendant the only individual that could possibly be identified as the guilty party by the complaining witness, or were there others near him at the time of the confrontation so as to negate the assertion that he was shown alone to the witness?

2. Where did the confrontation take place?

3. Were there any compelling reasons for a prompt confrontation so as to deprive the police of the opportunity of securing other similar individuals for the purpose of holding a line-up?

4. Was the witness aware of any observation by another or other evidence indicating the guilt of the suspect at the time of the confrontation?

5. Were any tangible objects related to the offense placed before the witness that would encourage identification?

6. Was the witness' identification based on only part of the suspect's total personality?

7. Was the identification a product of mutual reinforcement of opinion among witnesses simultaneously viewing defendant?

8. Was the emotional state of the witness such as to preclude objective identification?

9. Were any statements made to the witness prior to the confrontation indicating to him that the police were sure of the suspect's guilt?

10. Was the witness' observation of the offender so limited as to render him particularly amenable to suggestion, or was his observation and recollection of the offender so clear as to insulate him from a tendency to identify on a less than positive basis?

United States v. O'Conner, 282 F.Supp. 963, 965 (D.D.C.1968) aff'd, 137 U.S.App.D.C. 76, 78, 420 F.2d 644 (1969).

## V

We turn first to a consideration of Voltaggio's opportunity to scrutinize the assailant at the time of the robbery. We were desirous of, and at all times encouraged, a meticulous, detailed, albeit repetitious, development of every moment within the period commencing when Voltaggio first beheld the assailant, at the instant of the firing, up to and including the assailant's disappearance after he emerged from the Cougar. We allowed free reign to counsel on both sides, and they responded fully and without restraint of any kind. Such an approach, if the truth is to emerge, becomes imperative. And it did, thus enabling us to arrive at the conclusions with which this writing deals.

While the total time during which Voltaggio was in a position to observe petitioner during the robbery could not have lasted more than seven to ten seconds, we find that in the context of this case it was sufficient. The visibility conditions were excellent and during that period petitioner came within 25 feet of Voltaggio. Moreover Voltaggio was able to observe petitioner again as he jumped from the Cougar and fled up Sixth Avenue. On this occasion, Voltaggio was only 30 to 40 feet from petitioner as he emerged from the Cougar (Tr. 20; 573), a distance sufficiently short to enable Voltaggio to scrutinize once again the assailant's features and confirm in his mind the mental image developed seconds before at their confrontation at 46th Street and 8th Avenue. Though of itself this later opportunity for observation—it could have lasted no more than "2 to 3 seconds" (S.T.M. 196) [8]—would hardly have been an adequate independent source, it afforded Voltaggio an opportunity to confirm or bolster his image of the assailant developed seconds before at 46th Street and 8th Avenue.

Petitioner contends, however, that Voltaggio's opportunity for visual observation was inadequate; that its inadequacy is demonstrated by the various inconsistencies in Voltaggio's testimony regarding that opportunity. Thus at the Hearing he testified that when the assailant reached the northwest corner of 46th Street and 8th Avenue, he remained "standing there" for "a couple of seconds" before crossing the avenue (Tr. 562–563; 566). At both the state trial as well as pre-trial warrant hearing, Voltaggio testified that the assailant ran across 8th Avenue and got into the Cougar without stopping at any point along the way (HM 13; S.T.M. 162–163; 183). Similarly, Voltaggio contradicted himself on several occasions as to the duration of his opportunity to observe the assailant. Thus Voltaggio initially testified that almost 30 seconds elapsed from the time he first observed the assailant until the latter entered the Cougar (Tr. 14). On cross-examination, however, he changed his testimony, stating that he observed the assailant for "approximately ten to fifteen seconds" (Tr. 172). When questioned by the Court, Voltaggio recanted this testimony and acknowledged that he could not recall or estimate the time that elapsed during that period (Tr. 562; 566–567).

This argument, however, ignores several critical factors. First, as we stated above, the Hearing was held more than five years after the incident in question. Even the brightest recollection in the keenest of minds would have dimmed substantially during that interval and petitioner cannot be allowed to gain advantage from the lapse of time between the crime with which he was charged and the hearing years later of his appli-

---

8. It should be noted that Voltaggio was running up to the vehicle as the assailant was running from it (Tr. 573) and by his own testimony Voltaggio really saw the assailant only when he got out of the Cougar and started to run (Tr. 571–572). He also tes- tified, however, that the man who ran out of the Cougar was the same person who crossed 8th Avenue (Tr. 17) and that the Cougar was never out of his sight during the interim (Tr. 570).

cation for relief. Voltaggio did not impress us as a keen individual, one with sharp mental faculties; we so stated during the hearing. (Tr. 555). However, what was requisite in this instance was what the eye beheld, not what could be dredged from one's mental faculties. Recognition of a person or face is above all the product of a mental image which becomes fixed at the moment of confrontation. That the details of the time period of confrontation may fade with the passing of time is therefore not proof that the image when fixed was not accurate or reliable.

We must bear in mind that quite often an identification formed under conditions saturated with excitement is more impressive than an identification under uneventful circumstances. Voltaggio, we find, had the capacity to extract with certitude a mental image of the assailant.

The sworn witness' actual words constitute but one factor upon which we rely in our search for the truth. Unrecorded in the official transcript of the trial minutes are other extremely valuable aids. The voice and eyes (how often either or both betray the witness or fail to lend support to his words), the witness' gestures (natural, forced, simulated, etc.), and his general deportment while testifying. We look to these guides too and often find they are at least equally potent in the fulfillment of our mission to ascertain where truth lies, falsity exists, uncertainty prevails. We applied with extreme care each of these criteria and found Voltaggio's testimony firm and of convincing quality.

Though Voltaggio gave inconsistent testimony at the state trial and at the Hearing regarding some of the circumstances of the confrontation, he was on each occasion firm in his identification of petitioner. See Simmons v. United States, 390 U.S. 377, 385, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Gregory v. United States, 133 U.S.App.D.C. 317, 410 F.2d 1016 (1969), cert. denied, 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969); Clemons v. United States, *supra,* 408 F.2d at 1241, 1246. While this factor may often be more probative of the obduracy of a witness than of the reliability of his identification, it is our judgment predicated upon the quality of Voltaggio's testimony before us that his identification was reliable and without uncertainty.

Moreover, Voltaggio was not himself a victim of the robbery or shooting; the danger discussed in *Wade* that a victim's "understandable outrage may excite vengeful or spiteful motives" is consequently, absent. See United States v. Wade, *supra,* 388 U.S. at 230, 87 S.Ct. at 1934. On the contrary, Voltaggio was a trained police officer who upon observing the commission of a crime immediately concentrated his efforts upon apprehending the assailant and his accomplices. This must undoubtedly have included focusing upon the assailant's features for the purpose of making a subsequent identification. We therefore give greater weight to Voltaggio's testimony than we would were he an ordinary bystander or a victim of the crime.

## VI

Frequently in our trials, either to the Court or jury, the total evidence on the affirmative of a hotly contested identification comes exclusively from the oral testimony of a single witness. Yet, time and time again, that issue is resolved affirmatively even where numerous discrepancies in the witness' total testimony are revealed during the course of a properly exhaustive and exhausting cross-examination, and despite the testimony of many witnesses to the contrary. We venture the opinion that the ultimatum was based almost exclusively upon the conviction with which the witness rendered his testimony.

We conclude, therefore, that the Government produced clear and convincing evidence of a source for the in-court identification arising independently of the illegal confrontation.

## VII

We do not, however, ignore the possibility that a highly suggestive station-house confrontation could have distorted the mental image Voltaggio originally formed at the scene of the crime. United States v. Wade, *supra*, 388 U.S. at 241, 87 S.Ct. 1926, 18 L.Ed. 2d 1149. See Hawkins v. United States, 137 U.S.App.D.C. 103, 420 F.2d 1306 (1969); Williams v. United States, 133 U.S.App.D.C. 185, 409 F.2d 471 (1969); Clemons v. United States, *supra*, 408 F. 2d at 1250. A pre-trial procedure may be so suggestive that even a courtroom identification would be a violation of due process for the reason that the in-court identification may be based upon a witness' visual observation during the illegal confrontation rather than at the scene of the crime. See e. g. Rudd v. Florida, 477 F.2d 805 (5th Cir. 1973); United States v. Luck, 447 F.2d 1333 (6th Cir. 1971); United States v. Johnson, 461 F.2d 1165 (5th Cir. 1972). As stated in Hawkins v. United States, *supra*, 420 F.2d at 1307–1308, the burden of establishing that an in-court identification of an accused is based upon observations other than at the illegal confrontation requires "considerably more than a showing that the observations provided ample foundation upon which the witness, absent the illegal confrontation, could make an identification." See also United States v. Garner, 142 U.S. App.D.C. 15, 439 F.2d 525, 528 (1970) cert. denied, 402 U.S. 930, 91 S.Ct. 1531, 28 L.Ed.2d 864 (1971); United States v. Kemper, 140 U.S.App.D.C. 47, 433 F.2d 1153, 1159 n. 5 (Bazelon, C. J., concurring).

The alleged suggestive elements are found in three events: the warrant hearing on the evening of May 3, the stationhouse identification on the evening of May 4 and petitioner's arraignment on the evening of May 5. The stationhouse confrontation and the arraignment are described in detail above. As for the warrant hearing, it is important to note that Voltaggio described the as-

sailant only after he had heard the testimony of Horan and Chambers. Thus he first heard Horan's statement that he was sure petitioner was the assailant (Tr. 282). Indeed, Horan acknowledged that earlier that day he had advised Voltaggio of his determination concerning petitioner's guilt (Tr. 282). Moreover, Voltaggio was aware, on the basis of his own investigation, that the car in which he apprehended the Pyles brothers had been rented by petitioner the day before (Tr. 25; 57). Finally Voltaggio's description matched that just given by Chambers in his presence and contradicted his earlier description given to Horan that afternoon regarding the color of the assailant's pants (HM 12; 14; Tr. 188). Accordingly, at the conclusion of the warrant hearing Voltaggio was aware that a warrant had been issued for petitioner's arrest on the basis of his description as well as the fact that his name was on the Hertz rental agreement.

It is clear that there were improper elements of suggestion in the aforementioned pre-trial procedure. Inasmuch as Voltaggio's description was to be a basis of the arrest warrant, he should not have been allowed to hear Chambers' description before giving his own. Thus in Monteiro v. Picard, 443 F.2d 311 (1st Cir. 1971) cert. denied, 404 U.S. 1041, 92 S.Ct. 726, 30 L.Ed.2d 734 (1972) in-court identifications by a robbery victim and one witness were held inadmissible on the ground that at a prior line-up the victim and witness were asked to express their choice only after hearing a positive identification by the victim's wife who had also been a victim of the robbery. The court characterized the wife as a strong personality and reasoned that her prior identification was likely to have made an impression on her aging husband and the witness. See J. Quinn, "In the Wake of Wade," 42 U. Colo.L.Rev. 135, 153 (1970). Similarly Horan should not have made Voltaggio privy to his conclusions regarding petitioner's guilt. There was no need for such "cooperation," well-intentioned

though it may have been; its only effect was to reinforce Voltaggio's own conclusion that petitioner was the assailant. That an eyewitness is a policeman is no reason for investigating authorities to treat him any differently from any ordinary eyewitness even though his testimony may be given greater weight because of his training and expertise.

However, we find the conduct of the warrant hearing in no way created a "substantial likelihood of irreparable misidentification" at the show-up or subsequently at trial. Simmons v. United States, *supra,* 390 U.S. at 384, 88 S.Ct. 967, 19 L.Ed.2d 1247. See Neil v. Biggers, 409 U.S. 188, 198–199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). No identification was made at the warrant hearing and in this respect Monteiro v. Picard, *supra,* is distinguishable. Moreover, the show-up was conducted only 36 hours after the crime. Accordingly, in light of Voltaggio's opportunity to scrutinize the assailant at the scene of the crime on the preceding day, we are not persuaded that the identification at the show-up or the subsequent trial was based upon his having heard the testimony of Chambers or Horan. Monteiro v. Picard, *supra,* is further distinguishable on this ground for there the court found that the excluded identifications were not based on a source independent of the jail line-up. 443 F.2d at 313 n. 3.

■ The conduct of the show-up and showing of a photograph at the arraignment, though also unnecessarily suggestive, did not, we find, create a substantial likelihood of irreparable misidentification. Unquestionably, confrontations in which a single suspect is viewed in the custody of the police are highly suggestive. Regardless of what the police actually say to the viewer, it is inevitably apparent to him that they think they have caught the villain. Here, however, Voltaggio's exposure to petitioner at the stationhouse lasted less than a minute; he identified petitioner immediately upon looking at his face. We find no reason to suspect that the mental image formed by Voltaggio then was in any way different from that formed at the scene of the crime or in any way distorted or supplanted it. We see therefore no reason to conclude other than that Voltaggio was able to identify petitioner through his encounter at the crime rather than at the police station. Thus in United States ex rel. Phipps v. Follette, 428 F.2d 912 (2d Cir. 1970), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970) the Second Circuit permitted an in-court identification to stand despite its finding that the post-arrest show-up in which an eyewitness to a robbery identified the robbers was impermissibly suggestive. In an opinion which has become seminal in this Circuit regarding the admissibility of in-court identification testimony, the Court held that the opportunity for the eyewitness to observe the robbers while he struggled with them for some 20 to 30 seconds was sufficient to overcome the taint of the show-up.

Among the factors considered by the court were the motivation of the witness to observe the robbers, the speed and certainty of identification at the first exposure and the short lapse of time between the crime and the illegal confrontation. All these factors are applicable to the case at bar and are equally supportive of our conclusion that Voltaggio's in-court identification was admissible. Indeed the circumstances of that case are more questionable than our own for there the witness testified at a pretrial hearing that the in-court identification was based on his prior exposures to the robbers and on the illegal show-up as well. See 428 F.2d, *supra,* at 913. Similarly in United States v. Mooney, 417 F.2d 936 (8th Cir. 1969), cert. denied, 397 U.S. 1029, 90 S.Ct. 1280, 25 L. Ed.2d 541 (1970), the Court upheld admission of testimony as to a pre-trial photographic identification as well as one made when the appellant was pointed out to the witness in the court hallway just prior to the opening of trial. The court reasoned that the identifications, both pre-trial as well as in-court, were based upon fifteen seconds' obser-

vation of the defendant on a television screen as he sought to cash a stolen check.

> "[A] fifteen-second look is substantially more than a fleeting glance. We deem it sufficient time for one whose business it is to identify persons presenting checks for payment, to have retained in his memory the resemblance of the person he so observed. Clearly any objection could only go to the weight of the testimony not its admissibility, and the weight was for the jury's determination."

417 F.2d at 939. See also United States ex rel. Cummings v. Zelker, 455 F.2d 714 (2d Cir. 1972), cert. denied, 406 U.S. 927, 92 S.Ct. 1800, 32 L.Ed.2d 128 (1972); United States v. Famulari, 447 F.2d 1377 (2d Cir. 1971).

█ The use of a photograph at the arraignment avails petitioner hardly anything. The arraignment was one day after the show-up. Accordingly, seeing the photograph actually did not prompt the identification at that time. Because the arraignment was only two days after the robbery, yet some 21 months before commencement of the trial, it is highly unlikely that the photograph might have supplanted or distorted Voltaggio's original image of the assailant. There is no suggestion in the record that the showing of the photograph was motivated by any uncertainty on the part of Voltaggio or that he studied it for the purpose of improving his recollection. Inasmuch as no reasonable basis is apparent, we are unwilling to attribute such a motive to Horan or Voltaggio. In all probability Horan showed Voltaggio the photograph as a fellow officer in order to make him privy to the ongoing investigation, thinking that the identification procedure had already been completed. While, as we have already stated, Voltaggio should not have been made a participant in the investigation, his forced participation, whether with respect to Horan's conclusions as to petitioner's guilt or the use of the photograph, is not grounds for rendering his identification inadmissible. As stated in United

States v. Sutherland, 428 F.2d 1152, 1156 (5th Cir. 1970) cert. denied, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972), regarding an identification by a bank teller who had previously been shown the defendant's photograph:

> . . . if a teller in a bank is held up by a person he knows well, a picture spread, regardless of its suggestiveness, is unlikely to affect the teller's identification. But if the witness caught only a fleeting glimpse of an unknown fleeing felon, the likelihood of misidentification is substantially increased by a suggestive picture spread. Between these two extremes, the determination must be made based upon the facts in the particular case.

In the instant case the record is clear that Voltaggio's identification was unwavering and based upon adequate visual observation at the scene of the crime. In light of these factors as well as those already set forth above, we conclude that seeing the photograph did not taint Voltaggio's in-court identification.

## VIII

The cases upon which petitioner relies are inapposite. Thus in Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), the only Supreme Court decision that has ruled out an in-court identification on the basis of impermissible taint, the witness, after seeing the defendant in a suggestive line-up followed by a face-to-face confrontation, still could not be sure that the defendant was the right man and became convinced only after another misleading line-up several days later. The Court considered it incredible that a witness who had been through this experience could make an in-court identification free from the taint of what had gone before. United States ex rel. Phipps v. Follette, *supra*, 428 F.2d at 916. Similarly in United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148 (1971) where an in-court identification was precluded because of a prior impermissibly suggestive photographic display, the witness had been unsure of

her identification even when shown photographs of the defendant—photographs shown her because she theretofore had been unable to make a positive identification. Moreover, the witness had a restricted opportunity to observe the defendant at the scene of the crime and her description was limited and lacking in any distinctive features. See also United States v. Johnson, *supra*; Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969) where in addition to the absence of an independent basis the Court found that the witness, a bank teller, was under strong psychological pressure to make an identification. Similarly in both Kimbrough v. Cox, 444 F.2d 8 (4th Cir. 1971) and United States v. Fowler, 439 F.2d 133 (9th Cir. 1971), where pretrial photographic displays were found to have created a substantial likelihood of irreparable misidentification, the record is barren of any independent basis for the in-court identification. In *Kimbrough*, the pretrial identifications were made on the basis of photographs of defendant provided to the police by his estranged wife two weeks after the crime as a means of avenging her recent conviction for cohabitation. Defendant had not been linked to the crime until the police received the photographs, and at trial the only evidence offered was the identifications. The Court reasoned that the lapse of time between the crime and the identification, coupled with the unusual way in which the police focused upon the defendant, created a substantial likelihood of misidentification. Kimbrough v. Cox, *supra*, 444 F.2d at 10. No such circumstances are apparent in the facts of the case before us.

Finally we consider the case of Cooper v. Picard, *supra*, where an in-court identification was held inadmissible because it had been preceded by an unduly suggestive police line-up and an independent basis could not be established. In that case a husband and wife, victims of a robbery, were unable to accurately describe the robber despite having been within 3 to 20 feet of him for up to 5 minutes. They described the robber as about 20–21 years old, 5 feet 9 inches tall with blond hair. The defendant was in fact 27 years old, 5 feet 10 inches, dark hair, pock marks, sunken cheeks and a sallow complexion. Petitioner contends that the description given by Voltaggio was equally inaccurate and lacking in detail and therefore we should adopt a similar conclusion.

There are indeed discrepancies in the various descriptions of petitioner given by Voltaggio. Thus on the afternoon of the crime and at the warrant hearing Voltaggio described the assailant as brown or dark complexioned (Tr. 188; HM 14). At the trial and Hearing, however, he described him as "light skinned" (S.T.M. 149; Tr. 141). Similarly, Voltaggio originally described the assailant as wearing dark pants (Tr. 188), but at the warrant hearing said he wore "light pants" (HM 14). Such discrepancies, however, fail to give rise to any substantial doubt as to whether the image that Voltaggio retained from his observations at the scene of the crime was sufficiently and positively accurate as to form an independent basis for his subsequent identification. As was stated in Russell v. United States, 133 U.S. App.D.C. 77, 408 F.2d 1280, 1284 (1969), cert. denied, 395 U.S. 928, 89 S. Ct. 1786, 23 L.Ed. 245 (1969):

> "[R]ecognition of a person or face would seem to be as much the product of a subjective mental image as of articulable, consciously remembered characteristics. A man may see clearly in his "mind's eye" a face or a figure which he is hard put to describe adequately in words."

The inconsistencies in Voltaggio's descriptions with respect to the color of the assailant's pants and whether he was a light skinned or brown skinned Negro do not reflect upon the basic mental image which was the source of the identification. In this respect Cooper v. Picard, *supra*, is distinguishable for there the discrepancies demonstrated that the witnesses had not formed a definite mental image of the assailant. Indeed their de-

scription was wholly inaccurate and the wife was unable to give any description of the robber.

Here, however, the fact that at the trial—some 21 months after the crime —Voltaggio thought the assailant was a "light skinned" as opposed to "brown skinned" Negro cannot reasonably be said to reflect upon whether the in-court identification was derived from a source independent of the illegal show-up. Indeed, this particular feature is so subjective that even with the image of the assailant vividly in mind one would not know whether to describe his skin, unmistakably Negroid, as light or brown. We feel compelled to add that Voltaggio's vocabulary was markedly sparse.

As for the discrepancy in the description of the assailant's pants, even if Voltaggio were influenced by Chambers' testimony at the warrant hearing, we are not impressed that their color, whatever it may have been, was a basis for the in-court identification. Moreover, the descriptions given by Chambers and Voltaggio matched in all other respects and did not otherwise contradict Voltaggio's earlier description given on the afternoon of the crime before he heard Chambers' testimony. That description was accurate and sufficiently detailed to demonstrate that Voltaggio's in-court identification was based upon his observations at the scene of the crime and was not derived from the confrontation at the show-up.

### IX

We would be remiss if we failed to express to Stephen Marshall, Esq. our appreciation for a job very well done. We appointed him January 21, 1972, shortly after petitioner first made his appearance before us. At all times, lastly his careful and thorough post-hearing memorandum, his advocacy was of high order, indeed. Petitioner was well-served.

### X

Accordingly, on the facts and on the law we find that there was no "imper-

missible taint to the in-court identification." Petitioner's application for a writ of habeas corpus is therefore denied in all respects.

So ordered.