STATE of North Dakota, Plaintiff
and Appellee,

v.

Gregory Lee BRUGGEMAN,
Defendant and Appellant.

Cr. No. 616.

Supreme Court of North Dakota.

March 15, 1978.

Joseph A. Turman, Asst. State's Atty., Fargo, for plaintiff and appellee State of North Dakota.

David S. Maring, of DeMars, Backes & Maring, Fargo, for defendant and appellant.

VOGEL, Justice.

The appellant (Bruggeman) was found guilty of theft of property, a Class C felony. He appeals, and we affirm the conviction. The only question raised on appeal is the admissibility of an identification of the defendant by a police officer.

On January 16, 1977, the defendant was employed by West Fargo Union Stockyards as a yardman. On that date, a shipment of ewe lambs was received from Richard Pfliger. They were unloaded from trucks and placed in the alleys of Central Livestock, a commission merchant which leased space at the stockyards. The sheep were consigned to Central. The owner of the sheep and a friend named Jack Pfeiffer arrived and looked at the sheep. They immediately recognized 19 sheep in an alley assigned to McDonald Livestock, to which none of the sheep had been consigned. Knowledgeable sheepmen can recognize sheep from different flocks by the pattern of their shearing, as well as by size and general appearance. The two men inquired as to the count of sheep at Central and found a discrepancy in numbers. They asked the supervisory employees at Central, and subsequently McDonald, to examine the sheep in the McDonald alley, and all of them agreed that the sheep in the McDonald alley were part of the same lot as the sheep in the Central alley.

Upon investigation, it was found that the defendant Bruggeman was one of the two employees who had "yarded" the sheep— that is, had placed them in alleys. It was further discovered that 19 sheep had been recorded as consigned by an Allen Hanson, whose address was Glyndon, Minnesota, although the original entry record, called a "brand sheet," gave the address as Glydon. The brand sheet bore an employee number

assigned to the defendant Bruggeman, as did one of the records relating to the receipt of the lot of sheep from Pfliger.

Suspicion therefore centered upon Bruggeman immediately. A check was written to Allen Hanson, and mailed to Allen Hanson at Glyndon, Minnesota, by certified mail. An employee of the stockyards then alerted the chief of police at Glyndon by telephone and in person, asking the chief of police to watch for any one of three automobiles Bruggeman might be driving and to observe whoever picked up the check at the postoffice. The next day, the chief of police noticed one of the three vehicles described to him pass by the window of the police station. He observed the driver, and described him as a young man with several days' growth of beard, wearing a blue and white cap and dark-rimmed glasses. The chief of police went to the postoffice and observed a young woman sign for the envelope addressed to Allen Hanson. When she returned to the vehicle, the male driver drove out of town by a circuitous route, and the chief of police had a second opportunity to observe the driver at a distance of about 15 to 25 feet.

The next day, he observed Mrs. Bruggeman, whom he stated was not the young woman who had picked up the check, and also observed Bruggeman at the yard office in the stockyards, where he identified him as the man he had seen driving the vehicle at Glyndon. He also identified Bruggeman as that person at the preliminary hearing and at the trial, and identified a single photograph of Bruggeman.

The chief of police ascertained that the vehicle he observed at Glyndon was registered to Greg Bruggeman.

We are asked to reverse the conviction because of error of constitutional dimensions in allowing the identification in evidence. We decline to do so.

We have had two occasions recently to consider the question of single-photograph identification. *State v. Azure*, 243 N.W.2d 363 (N.D.1976), and *State v. LaFromboise*, 246 N.W.2d 616 (N.D.1976). We have also been referred to several Federal cases, in-cluding one upon which the appellant most relies, *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Since deciding that case, the United States Supreme Court has decided *Moore v. Illinois*, —— U.S. ——, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977).

The first thing to be noted about the Federal cases is that all of them relate to identification of an alleged criminal by a victim of that criminal or by an undercover officer purchasing contraband. In all of them, the identification was crucial to the prosecution, since there was little or nothing to connect the defendant with the offense except the identification.

The present case is not at all similar, as the facts we outlined above show. The evidence connecting the defendant with the crime was probably ample, even without the identification of the chief of police, to convict. In addition to the evidence outlined above, it was shown by the prosecution that Bruggeman misspelled Glyndon in a handwriting sample in the same way it was misspelled on the brand sheet for the 19 missing sheep, and it was also shown that he had taken time off from work for an hour and a half at the time the check was being picked up at the Glyndon postoffice, about 15 miles from his place of work. He told his supervisor he was going to the doctor's office. No person by the name of Allen Hanson was known to a long-time postoffice clerk at Glyndon. Time records also indicated that Bruggeman was at work at the time the 19 sheep were diverted to the McDonald pens.

Thus this case is factually far different from the single-photo identification cases relied upon by the appellant. Here, the identification was made by a trained police officer while performing a routine piece of investigation. Bruggeman was already a suspect when he was observed by the chief of police, who promptly identified a photograph and the defendant himself as the person he had seen driving the vehicle used to transport the young woman who picked up the check made out to the fictitious Allen Hanson.

In many respects this case is similar to *United States ex rel. Robinson v. Vincent*, 371 F.Supp. 409 (S.D.N.Y.1974), *affirmed* 506 F.2d 923, *cert. denied sub nom. Robinson v. Vincent*, 421 U.S. 969, 95 S.Ct. 1962, 44 L.Ed.2d 458 (1975). In that case a policeman saw the prone victim of a shooting, with the assailant standing over him, watched the assailant run away and pursued him, viewing him for a total of about 10 seconds, and later identified him at a station house and a preliminary hearing, after seeing a single photograph. There were some discrepancies in descriptions given at various times, but the identification was always positive. It was held that the identification, even though without a lineup and made after seeing the photograph, was not made under circumstances so suggestive as to require exclusion of the testimony. The court said:

"Moreover, Voltaggio was not himself a victim of the robbery or shooting; the danger discussed in *Wade* that a victim's 'understandable outrage may excite vengeful or spiteful motives' is consequently, absent. See *United States v. Wade, supra*, 388 U.S. [218] at 230, 87 S.Ct. [1926] at 1934 [18 L.Ed.2d 1149]. On the contrary, Voltaggio was a trained police officer who upon observing the commission of a crime immediately concentrated his efforts upon apprehending the assailant and his accomplices. This must undoubtedly have included focusing upon the assailant's features for the purpose of making a subsequent identification. We therefore give greater weight to Voltaggio's testimony than we would were he an ordinary bystander or a victim of the crime.

.  .  .  .  .

"The use of a photograph at the arraignment avails petitioner hardly anything. The arraignment was one day after the show-up. Accordingly, seeing the photograph actually did not prompt the identification at that time. Because the arraignment was only two days after the robbery, yet some 21 months before commencement of the trial, it is highly unlikely that the photograph might have supplanted or distorted Voltaggio's original image of the assailant. There is no suggestion in the record that the showing of the photograph was motivated by any uncertainty on the part of Voltaggio or that he studied it for the purpose of improving his recollection. Inasmuch as no reasonable basis is apparent, we are unwilling to attribute such a motive to Horan or Voltaggio. In all probability Horan showed Voltaggio the photograph as a fellow officer in order to make him privy to the ongoing investigation, thinking that the identification procedure had already been completed. While, as we have already stated, Voltaggio should not have been made a participant in the investigation, his forced participation, whether with respect to Horan's conclusions as to petitioner's guilt or the use of the photograph, is not grounds for rendering his identification inadmissible. As stated in *United States v. Sutherland*, 428 F.2d 1152, 1156 (5th Cir. 1970), *cert. denied* 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972), regarding an identification by a bank teller who had previously been shown the defendant's photograph:

.  .  . if a teller in a bank is held up by a person he knows well, a picture spread, regardless of its suggestiveness, is unlikely to affect the teller's identification. But if the witness caught only a fleeting glimpse of an unknown fleeing felon, the likelihood of misidentification is substantially increased by a suggestive picture spread. Between these two extremes, the determination must be made based upon the facts in the particular case.

In the instant case the record is clear that Voltaggio's identification was unwavering and based upon adequate visual observation at the scene of the crime. In light of these factors as well as those already set forth above, we conclude that seeing the photograph did not taint Voltaggio's in-court identification." 371 F.Supp. 409 at 418, 421.

The present case is also similar in many respects to our own companion cases of *State v. Azure, supra,* and *State v. LaFromboise, supra.* In *State v. Azure,* it was argued that testimony of one of several persons who identified the defendant as being in the neighborhood of the crime was made inadmissible by showing him a single photograph of the defendant. In *State v. LaFromboise,* the testimony of the same person (who was not a victim) was similarly attacked, as was the testimony of the victim. In both cases we affirmed convictions, saying that, among other things:

". . . the in-court identification by Hanson was unequivocal, there is no indication that it was based upon the out-of-court photographic identification, the photographic identification was made on the same day as the robbery occurred, and Hanson had no motive to falsify." *State v. Azure, supra,* 243 N.W.2d at 366; adopted in *State v. LaFromboise, supra,* 246 N.W.2d at 620.

In the case before us, the facts are such that it is extremely doubtful whether the witness's positive identification of Bruggeman as the person who drove the vehicle at the time the check was picked up was related at all to the fact that he also identified a photograph as being that of the same person. The mere fact that a witness observed a photograph at one time does not necessarily tend to show that his identification of the photographed person at the trial was due to observation of the photograph. In the present case, where the time lapse is even less than in *Robinson, supra,* it is far more likely that his identification was due to his direct observation of the individual driving the vehicle.

Even if we were to ignore the fact that the chief of police was neither a victim nor an undercover agent, but only a police officer tracing the fruits of a previous crime, and if we were to apply the tests of *Manson v. Brathwaite, supra,* we would still hold in this case that the evidence of the chief of police was admissible. In *Manson,* the rule is stated that identification testimony, even if based upon suggestive identification procedures, is admissible if the totality of the circumstances is such that the identification is deemed reliable. Among the factors to be considered in determining reliability, according to *Manson,* are the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. In the case before us, the chief of police had two opportunities to view the suspect, he was a trained police officer who knew that he might be called upon to testify and would therefore be attentive, his description of the person observed apparently conformed to the facts, he never demonstrated any uncertainty as to his identification, and the time between his observation and his subsequent personal identification was approximately one day. In all of these respects the reliability of the testimony in the present case at least equals, or perhaps exceeds, the reliability of the testimony in *Manson,* which the United Supreme Court said was sufficiently reliable to be admissible.

It was also admissible under the standards set forth in our cases, *State v. Azure, supra,* and *State v. LaFromboise, supra.* The totality of the circumstances is such that the evidence is reliable and admissible, under either Federal or State standards.

Affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.